**GLANCY PRONGAY & MURRAY LLP**
LIONEL Z. GLANCY (#134180)
ROBERT V. PRONGAY (#270796)
LESLEY F. PORTNOY (#304851)
CHARLES H. LINEHAN (#307439)
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: rprongay@glancylaw.com

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ATUL SINGH DEORA, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> NANTHEALTH, INC., PATRICK SOON-SHIONG, PAUL A. HOLT, MICHAEL S. SITRICK, KIRK K. CALHOUN, MARK BURNETT, EDWARD MILLER, MICHAEL BLASZYK, JEFFERIES LLC, COWEN AND COMPANY, LLC, FIRST ANALYSIS SECURITIES CORPORATION, CANACCORD GENUITY INC., and FBR CAPITAL MARKETS & CO., <br><br> Defendants. | Case No.: <br><br> CLASS ACTION <br><br> **COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff Atul Singh Deora ("Plaintiff"), by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by NantHealth, Inc. ("NantHealth" or the "Company"), with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by NantHealth; and (c) review of other publicly available information concerning NantHealth.

## NATURE OF THE ACTION AND OVERVIEW

1.     This is a class action on behalf of persons or entities who purchased or otherwise acquired NantHealth securities: (1) pursuant and/or traceable to the Company's registration statement and prospectus (collectively, the "Registration Statement") issued in connection with the Company's initial public offering on or about June 1, 2016 (the "IPO" or the "Offering"); and/or (2) between June 1, 2016, and March 6, 2017, inclusive (the "Class Period").   Plaintiff seeks to pursue remedies under the Securities Act of 1933 (the "Securities Act") and under the Securities Exchange Act of 1934 (the "Exchange Act").

2.     NantHealth healthcare company.  The Company purportedly provides diagnostics tailored to specific molecular profiles of patient tissues, integrating the molecular data with real-time biometric signal and phenotypic data to track patient

outcomes and deliver precision medicine.  The Company claims that it possesses a comprehensive set of advanced molecular diagnostics and decision support solutions that enable evidence-based clinical practice, including Genomic Proteomic Spectrometry Cancer ("GPS Cancer").  GPS Cancer purportedly enables diagnosis at the molecular level by measuring the whole genome and proteome of a patient— thereby potentially predicting the patient's response and resistance to particular therapeutics.

3.     On June 1, 2016, NantHealth priced its IPO of 6,500,000 shares of common stock, at a price of $14.00 per share.  The Company received approximately $83.5 million in the Offering, net of underwriting discounts, commissions, and offering costs.

4.     On March 6, 2017, *STAT*, a news organization focused on medical industry reporting, published an article alleging that NantHealth founder, Patrick Soon-Shiong ("Soon-Shiong"), had donated $12 million to the University of Utah from three different tax-exempt entities controlled by him under a contract that required the University to funnel much of that money into NantHealth.  *STAT* further alleged that two tax experts it had spoken to indicated that the deal "appeared to violate federal tax rules governing certain charitable donations, amounting to indirect self-dealing by Soon-Shiong and his foundations" and that a former head of the IRS's tax-exempt division stated "[t]hey're laundering the funds through the University of Utah."   *STAT* also alleged that NantHealth misled investors in

reporting its third-quarter earnings in November of 2016.  The Company claimed that it had received 524 orders for the GPS Cancer test, and that one-third of those orders came from the University of Utah deal, but that the geneticist leading the research told *STAT* that the work they ordered from NantHealth had nothing to do with GPS Cancer.

5.    On this news, NantHealth's share price fell $1.67 per share, or 23.3%, to close at $5.50 per share on March 6, 2017—which amounted to a 60% decline from the IPO price of $14.00 per share.

6.    Throughout the Class Period, Defendants made false and/or misleading statements, and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements regarding, and/or failed to disclose: (1) that Soon-Shiong had donated funds through nonprofit organizations to the University of Utah for the purpose of funneling those funds back into NantHealth; (2) that, as such, the Company and Soon-Shiong participated in the violation of federal tax laws— exposing the Company to possible civil and criminal liability; (3) that the Company improperly recorded orders received from the University of Utah as GPS Cancer test orders; (4) that, as a result, the Company reported false and inflated GPS Cancer order figures for the third quarter of 2016; and (5) that, as a result of the foregoing, the Company's financial statements and Defendants' statements about NantHealth's business, operations, and prospects, were materially false and misleading.

7.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

8.    The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o), and Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

9.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 22 of the Securities Act (15 U.S.C. § 77v), and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

10.    Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  A significant portion of Defendants' actions, and the subsequent damages, took place in this Judicial District.  Additionally, NantHealth's principal executive offices are located within this Judicial District.

11.    In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

# PARTIES

12.     Plaintiff Atul Singh Deora, as set forth in the accompanying certification, incorporated by reference herein, purchased NantHealth shares during the Class Period, pursuant to the Registration Statement issued in connection with the Company's IPO, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

13.     Defendant NantHealth, Inc. is a Delaware corporation with its principal executive offices located in Culver City, California.

14.     Defendant Patrick Soon-Shiong was the Chief Executive Officer ("CEO") and Chairman of the Board of Directors of NantHealth at all relevant times.  Soon-Shiong signed or authorized the signing of the Company's Registration Statement filed with the SEC.

15.     Defendant Paul A. Holt ("Holt") was the Chief Financial Officer ("CFO") of NantHealth at all relevant times.  Holt signed or authorized the signing of the Company's Registration Statement filed with the SEC.

16.     Defendant Michael S. Sitrick ("Sitrick") was a director of NantHealth, and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

17.   Defendant Kirk K. Calhoun ("Calhoun") was a director of NantHealth, and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

18.   Defendant Mark Burnett ("Burnett") was a director of NantHealth and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

19.   Defendant Edward Miller ("Miller") was a director of NantHealth, and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

20.   Defendant Michael Blaszyk ("Blaszyk") was a director of NantHealth, and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

21.   Defendants Soon-Shiong and Holt are collectively referred to hereinafter as the "Individual Defendants."  The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of NantHealth's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information

available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.  The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

22.    Defendants Soon-Shiong, Holt, Sitrick, Calhoun, Burnett, Miller, and Blaszyk are collectively referred to hereinafter as the "Section 11 Individual Defendants."

23.    Defendant Jefferies LLC ("Jefferies") served as an underwriter of the Company's IPO.  Jefferies agreed to purchase 2,600,000 shares in the IPO, exclusive of the option to purchase additional shares.

24.    Defendant Cowen and Company, LLC ("Cowen") served as an underwriter of the Company's IPO.  Cowen agreed to purchase 1,950,000 shares in the IPO, exclusive of the option to purchase additional shares.

25.    Defendant First Analysis Securities Corporation ("First Analysis") served as an underwriter of the Company's IPO.  First Analysis agreed to purchase 910,000 shares in the IPO, exclusive of the option to purchase additional shares.

26.    Defendant Canaccord Genuity Inc. ("Canaccord") served as an underwriter of the Company's IPO.  Canaccord agreed to purchase 520,000 shares in the IPO, exclusive of the option to purchase additional shares.

27. Defendant FBR Capital Markets & Co. ("FBR") served as an underwriter of the Company's IPO. FBR agreed to purchase 520,000 shares in the IPO, exclusive of the option to purchase additional shares.

28. Defendants Jefferies, Cowen, First Analysis, Canaccord, and FBR are collectively referred to hereinafter as the "Underwriter Defendants."

29. The Company, the Section 11 Individual Defendants, and the Underwriter Defendants, are collectively referred to hereinafter as the "Section 11 Defendants."

## SUBSTANTIVE ALLEGATIONS
### Background

30. The Company purportedly provides diagnostics tailored to specific molecular profiles of patient tissues, integrating the molecular data with real-time biometric signal and phenotypic data to track patient outcomes and deliver precision medicine. The Company claims that it possesses a comprehensive set of advanced molecular diagnostics and decision support solutions that enable evidence-based clinical practice, including GPS Cancer. GPS Cancer purportedly enables diagnosis at the molecular level by measuring the whole genome and proteome of a patient—thereby potentially predicting the patient's response and resistance to particular therapeutics.

31. On June 1, 2016, the SEC declared effective the Form S-1 that NantHealth filed on May 6, 2016 and repeatedly amended, until on or about June 1,

2016, when the Company filed with the SEC the final Form S-1 amendment.  The Form S-1, and all amendments thereto form part of the Registration Statement for the IPO.

32.    On June 1, 2016, NantHealth priced its IPO of 6,500,000 shares of common stock, at a price of $14.00 per share, exclusive of the underwriters' option to purchase 975,000 additional shares.  The Company received approximately $83.5 million in the Offering, net of underwriting discounts, commissions, and offering costs.

### Materially False and Misleading Statements Issued During the Class Period

33.    The Class Period begins on June 1, 2016.  On that day, the SEC declared the Company's Registration Statement effective.  Under applicable SEC rules and regulations, the Registration Statement was required to disclose known trends, events or uncertainties that were having, and were reasonably likely to have, an impact on the Company's continuing operations.

34.    With respect to the Company's GPS Cancer test, the Registration Statement, in relevant part, stated:

**Key Factors Affecting Our Performance**

We believe that our performance and future success are dependent upon a number of factors, including our ability to (i) commercialize and grow acceptance and adoption of our GPS Cancer solutions, (ii) continue to expand sales of CLINICS, NantOS and NantOS apps to both new and existing clients, (iii) acquire and integrate technologies and businesses that would enhance our offering, (iv) innovate and enhance our Systems Infrastructure and platforms, including in particular, integrating our capabilities in support of growth of GPS Cancer, and (v) successfully invest in our infrastructure. While each of these areas presents

significant opportunities for us, they also pose significant risks and challenges that we must address. See the section titled "Risk Factors" for more information.

### Commercialize and Expand the Adoption of Our GPS Cancer Solution

Our performance depends on our ability to drive adoption of GPS Cancer and reimbursement at levels that are profitable. We also receive revenue from our sale of NantOmics' whole genome sequencing and proteomic analysis based on certain amounts billed for the NantOmics services, as specified in our Reseller Agreement. GPS Cancer is the only comprehensive and commercially available clinical cancer platform incorporating and integrating whole genome (comparing both a patient's normal and tumor tissue), RNA, proteomic and molecular pathways information into a clinical report that analyzes this data and identifies actionable targets and potential clinical treatment decisions. We believe the potential market for GPS Cancer is significant. We are increasing recognition of GPS Cancer by engaging and educating oncologists, cancer patients, patient advocacy groups and other key oncology stakeholders and pursuing reimbursement. In January 2016, a large health plan announced that it would provide insurance coverage for GPS Cancer, representing the nation's first such insurance coverage for a comprehensive whole genome and proteome molecular diagnostic program in the United States.

\*      \*      \*

### Our Market Opportunity

We have a unique opportunity to become the leading next-generation, evidence-based, personalized healthcare company by applying novel diagnostics tailored to the specific molecular profiles of patient tissues, integrated clinically to track patient outcomes. We believe the increasing focus on value-based reimbursement models and evidence-based, personalized medicine will drive validation and adoption of CLINICS, positioning us at the forefront of multiple significant growing market opportunities. Recent statistics show that 41% of Americans will be diagnosed with cancer at some point in their lives, resulting in a potential $173 billion of medical costs by 2020. Further, cancer patients receiving chemotherapy average $111,000 in annual medical and pharmacy costs. We estimate the potential global market opportunity for CLINICS, including GPS Cancer, to be in excess of $50 billion annually, as our platforms and solutions enable more effective treatment decisions for critical illnesses.

We believe the potential addressable market for CLINICS will continue to grow in relation to the market-share gains of value-based models. Additionally, we see the precision medicine market growing substantially as comprehensive diagnostics and evidence-based medicine become increasingly important across multiple disease areas and likely assuming greater share of the combined biopharmaceutical and diagnostics markets. We expect several factors to drive adoption of our universal diagnostics solution GPS Cancer, which enables an

increased understanding of molecular pathways and their targets, such as

- improved pharmacoeconomics, including the use of more cost-effective drugs approved for other indications (such as asthma and diabetes) in cancer treatment regimens;

- a clearer understanding of critical drug resistance information;

- increased adoption of bundled payments as providers and payors recognize the efficiency of optimized therapies; and

- increased awareness and published clinical results demonstrating the benefits of evidence-based molecular medicine.

## Our Competitive Strengths

We have invested significant capital and healthcare and biotechnology expertise over nearly a decade to develop, acquire and integrate the necessary components to establish a comprehensive, adaptive learning system designed to address many of the challenges faced by stakeholders across the continuum of care.

We believe our unique capabilities will facilitate the shift from a siloed domain approach to a more patient-centered and patient-empowered approach, and from retrospective claims data mining to real-time, proactive biometric and phenotypic analysis. We believe molecular profile data will significantly enhance outcomes and allow a shift from cohort statistics driven pathways to individualized treatment pathways and accelerate the benefit of value-based models. We also believe the unique multidimensional approach of combining biometric and phenotypic data with targeted molecular pathway information will lead to network effects unavailable to parties looking at each segment individually.

We believe we are differentiated by CLINICS, which creates a novel, comprehensive ecosystem with powerful network effects. In our view, clients who adopt our platforms receive more coordinated, targeted patient therapy and care, which leads to improved outcomes at lower cost. Each data point contributes to the broader dataset, enhancing the continuous learning system and driving value to the user and overall adoption of the system. We believe our success will be based on the following key strengths and advantages:

. . .

- ***A clinical comprehensive molecular analysis solution***. We have exclusive rights to NantOmics' proprietary clinical comprehensive molecular analysis solution, GPS Cancer, for the clinical market that examines the entire genome, both in tumor and normal tissue samples, in addition to RNA and protein expression in the tumor sample, including quantitative proteomics measured by mass spectrometry. The test provides quantitative analysis of targeted proteins at the attomolar level, while also comparing 6 billion DNA base pairs (tumor and

normal) and sequencing 200,000 RNA transcripts and provides analysis for over 15,000 nodes within approximately 1,500 protein pathways. Using this solution, we create a full genomic and quantitative proteomic profile designed to identify alterations in cellular signaling behavior that are driving disease progression. Unique adaptive machine learning algorithms match the alterations to a library of known signaling pathways and drug and drug targets, irrespective of indication, to predict the effectiveness of personalized therapies and points of resistance. We are able to deliver to providers and payors integrated and comprehensive test results aimed to arrive at improved care decisions for patients. We deliver a concise, actionable GPS Cancer report that matches these alterations with approved on-label and investigative targeted therapies and clinical trials, and GPS Cancer is the only comprehensive and commercially available clinical cancer platform incorporating and integrating whole genome (comparing both a patient's normal and tumor tissue), RNA, proteomic and molecular pathways information into such a report. We have signed agreements or agreements in principle with several customers for GPS Cancer.

35.    With respect to the Company's agreement with the University of Utah, the Registration Statement, in relevant part, stated:

We expect to launch our commercial sequencing and molecular analysis solution, or GPS Cancer, in the second quarter of 2016. In January 2015, we entered into an agreement to provide certain research related sequencing services to a university which is engaged in researching the genetic causes of certain hereditary diseases. The agreement provides for the university to pay us $10.0 million in exchange for our providing sequencing services through our reseller agreement with NantOmics. At the university's request, certain non-profit organizations provided partial funding for the sequencing and related bioinformatics costs associated with the project. Our Chairman and Chief Executive Officer serves as a member of the board of directors and may have significant influence or control over these organizations. The university was not contractually or otherwise required to use our molecular profiling solution or any other products or services as part of the charitable gift. In 2015, we provided $6.2 million of services to the university, which has been recorded as a deemed capital contribution instead of revenue due to the reasons described above. In 2016, we expect to complete another $3.8 million in services which will also be recorded as deemed capital contributions.

36.    On August 9, 2016, NantHealth issued a press release entitled, "NantHealth Reports Strong 2016 Second-Quarter Revenues and Continued Progress On GPS Cancer and Nantos Platform." Therein, the Company, in relevant part, stated:

**Culver City, Calif. – August 09, 2016** — NantHealth, Inc. (NASDAQ-GS: NH), a next-generation, evidence-based, personalized healthcare company, today reported financial results for its 2016 second quarter ended June 30, 2016. The company completed its initial public offering (IPO) in early June 2016, raising net proceeds of approximately $83.2 million.

For the 2016 second quarter, total net revenues increased 167% to $31.5 million from $11.8 million in last year's second quarter. Gross profit grew 69% to $9.3 million, from $5.5 million, for the 2015 second quarter. Selling, general and administrative (SG&A) expenses were $47.2 million, including stock compensation expense related to the company's IPO, compared with $17.8 million for the prior year second quarter. Research and development (R&D) expenses, including stock compensation expense related to the company's IPO, increased to $24.3 million from $5.0 million in the comparable quarter of last year.

With the inclusion of stock based compensation expense related to the IPO, equal to $0.42 per share, net loss was $54.1 million, or $0.52 per share, compared with $17.2 million, or $0.21 per share, for the 2015 second quarter. Financial results for the 2016 second quarter included approximately $43.7 million in stock based compensation, equal to $0.42 per share, related to the vesting of equity tied to the company's Initial public offering. On a non-GAAP basis, for the 2016 second quarter, adjusted net loss was $16.5 million, or $0.15 per share, compared with adjusted net loss of $14.3 million, or $0.15 per share, in the prior year second quarter.

"We achieved stellar topline results across all of our revenue lines, reflecting how strongly customers have responded to NantHealth's innovative offerings," said Patrick Soon-Shiong, M.D., chief executive officer and chairman of NantHealth. "Our strong second-quarter financial performance included revenues recognized from several large implementations and service contracts for our technology offerings, which were completed and delivered earlier than anticipated. As a result, we recognized certain revenues in our second quarter that we previously projected to be recorded in the second half of 2016.

"Looking ahead, we are focused on adding customers and executing on our opportunities across the spectrum of our offerings. In addition, the acquisitions we completed in the last year are paying dividends and our GPS Cancer product continues to gain traction and acceptance among insurers. Combined, these efforts and initiatives will drive our growth in the near term and beyond."

**GPS Cancer – Highlights**

- **Number of covered cancer lives:** at June 30, the number of patients with cancer covered by a payer for GPS testing was approximately 180,000. Subsequent to the quarter through August 9, the company added approximately 20,000 covered cancer lives, bringing the total number of cancer patients covered by GPS Cancer to approximately 200,000.

- **Number of GPS Cancer payers:** at June 30, the number of payers covering GPS Cancer was three. Subsequent to the end of the quarter through August 9, the company added three new payers, bringing the total number of payers covering GPS Cancer to six, resulting in 200,000 covered cancer lives.

- **Number of international GPS Cancer payers:** During the second quarter, the company added an international reseller.

37.    On August 15, 2016, NantHealth filed its Quarterly Report with the SEC on Form 10-Q for the quarterly period ended June 30, 2016.  The Company's 10-Q was signed by Defendant Holt and reaffirmed the Company's financial results previously announced on August 9, 2016.

38.    On November 7, 2016, NantHealth issued a press release entitled, "Nanthealth Reports 76% Increase in Total Q3 Net Revenue 2016 vs 2015, Gross Profit Triples."  Therein, the Company, in relevant part, stated:

> **Culver City, Calif. - November 7, 2016** - NantHealth, Inc. (NASDAQ-GS: NH), a next-generation, evidence-based, personalized healthcare company, today reported financial results for its third quarter ended September 30, 2016.
>
> For the 2016 third quarter, total net revenue increased 76% to $25.4 million from $14.4 million in last year's third quarter. Gross profit more than tripled to $8.1 million, from $2.3 million, for the 2015 third quarter. Selling, general and administrative (SG&A) expenses were $24.7 million compared with $18.1 million for the prior year third quarter. Research and development (R&D) expenses increased to $13.9 million from $7.0 million in the comparable quarter of last year.
>
> Net loss for the 2016 third quarter was $36.9 million, or $0.30 per share, compared with $23.0 million, or $0.24 per share, for the 2015 third quarter. Financial results for the 2016 third quarter included approximately $5.5 million of intangible amortization and $5.2 million in non-cash, stock-based compensation expense, equal to $0.10 per share. On a non-GAAP basis, for the 2016 third quarter, adjusted net loss was $22.4 million, or $0.18 per share, compared with $18.2 million, or $0.17 per share, in the prior year third quarter.
>
> "The significant increase of total net revenue was primarily driven by a 252% increase in SaaS revenue," said Patrick Soon-Shiong, M.D., chief executive officer and chairman of NantHealth. "We continue to make great strides in healthcare interoperability and connectivity. With regard to our GPS Cancer Test, education in the oncology community is progressing rapidly. As the oncologists begin to understand that this

test better informs them and their patients as to the biology of the cancer and which drugs may or may not be effective based on the genomics and proteomics signature, adoption is progressing as evidenced by the over 100% increase in number of oncologists ordering the test. We are gratified to experience this response since we believe the test is as important to guide the physician as to which drugs not to administer as well as which agents may show sensitivity. The opportunity to have this information on hand before treatment begins is having an impact on physicians' acceptance of the value that this test can bring to cancer care. The challenge and opportunity remains, our need to continue this educational process both with provider and payer. We have ramped up our efforts to educate oncologists in target markets, secured new payer coverage and streamlined IT implementations."

**GPS Cancer – Highlights**

- **Number of covered cancer lives:** at September 30, 2016 the number of patients with cancer covered by a payer for GPS testing was approximately 200,000. Subsequent to the end of the quarter, the company reported a coverage agreement with Horizon BCBS for a pilot study.

- **Number of GPS Cancer payers:** at September 30, 2016 the number of payers covering GPS Cancer was seven, representing 200,000 covered cancer lives. Discussions are in progress with 17 payers, increasing from 13 in Q2. GPS Cancer Coverage

- **Number of international GPS Cancer payers:** Subsequent to the end of the third quarter, the company added an additional international reseller bringing the total of international resellers to two.

- **Number of GPS Cancer Tests:** 524 ordered in Q3.

39.     On November 10, 2016, NantHealth filed its Quarterly Report with the SEC on Form 10-Q for the quarterly period ended September 30, 2016.   The Company's Form 10-Q was signed by Defendants Soon-Shiong and Holt, and reaffirmed the Company's financial results previously announced on November 7, 2016.

40.     The above statements contained in ¶¶34-39 were materially false and/or misleading when made because Defendants failed to disclose: (1) that Soon-Shiong had donated funds through nonprofit organizations to the University of Utah for the

purpose of funneling those funds back into NantHealth; (2) that, as such, the Company and Soon-Shiong participated in the violation of federal tax laws—exposing the Company to possible civil and criminal liability; (3) that the Company improperly recorded orders received from the University of Utah as GPS Cancer test orders; (4) that, as a result, the Company reported false and inflated GPS Cancer order figures for the third quarter of 2016; and (5) that, as a result of the foregoing, the Company's financial statements and Defendants' statements about NantHealth's business, operations, and prospects, were materially false and misleading.

### Disclosures at the End of the Class Period

41.     On March 6, 2017, *STAT*, a news organization focused on medical industry reporting, published an article alleging that NantHealth founder, Patrick Soon-Shiong ("Soon-Shiong"), had donated $12 million to the University of Utah from three different tax-exempt entities controlled by him under a contract that required the University to funnel much of that money into NantHealth. *STAT* further alleged that two tax experts it had spoken to indicated that the deal "appeared to violate federal tax rules governing certain charitable donations, amounting to indirect self-dealing by Soon-Shiong and his foundations" and that a former head of the IRS's tax-exempt division stated "[t]hey're laundering the funds through the University of Utah." *STAT* also alleged that NantHealth misled investors in reporting its third-quarter earnings in November of 2016.  The Company claimed that it had received 524 orders for the GPS Cancer test, and that one-third of those

orders came from the University of Utah deal, but that the geneticist leading the

research told *STAT* that the work they ordered from NantHealth had nothing to do

with GPS Cancer.  In greater part, *STAT* stated:

> He was greeted like a star philanthropist.
> The world's richest doctor had just made a $12 million gift to the University of Utah. Members of the university community were urged to come thank him. And so, a crowd gathered.
>
> For months, Dr. Patrick Soon-Shiong would continue to reap praise for his generosity in publicity put out by the university. Not mentioned in any of the tributes: $10 million of his donation would be sent right back to one of his companies. And the contract for his gift was worded in a way that left the University of Utah with no other choice.
>
> The university health system did get free and valuable information for genetics research through the deal. But a STAT investigation has found that Soon-Shiong benefited even more from his charitable donation.
>
> He got reams of patient data to help him build a new commercial product meant to assess patients' risk of rare and inherited diseases. He got a stream of cash for one of his struggling companies.
>
> And the deal made it possible for his company to inflate, by more than 50 percent, the number of test orders it reported to investors late last year while updating them on interest in a flagship product, a diagnostic tool known as GPS Cancer. Soon-Shiong's team counted genetic sequencing ordered by the University of Utah in those order numbers — even though the work for the university did not have anything to do with diagnosing or recommending treatments for cancer patients.
>
> Even in the world of academic donations, which the wealthy often use to burnish their image or advance pet causes, the arrangement stands out as highly unusual.
>
> STAT has previously detailed how Soon-Shiong's high-profile cancer moonshot initiative achieved little scientific progress in its first year, instead functioning primarily as a marketing tool for GPS Cancer.
>
> The University of Utah deal — laid out in contracts obtained by STAT through a public records request — illustrates how Soon-Shiong boosted his business through his philanthropy. He has been accused of doing just that in at least two legal filings, but the Utah contracts offer the first concrete example, spelled out in black and white.
>
> Four tax experts who reviewed the contracts at STAT's request all agreed that the Utah deal was suspicious. Two said it appeared to violate federal tax rules governing certain charitable donations, amounting to indirect self-dealing by Soon-Shiong and his foundations.

"They're laundering the funds through the University of Utah," said Marc Owens, a tax lawyer with Loeb & Loeb. Owens, who said the contracts appeared to violate federal rules, previously spent a decade as head of the Internal Revenue Service's tax-exempt division.

The other two legal experts said the contracts were cleverly worded in a way that would likely steer clear of self-dealing — but agreed that, at the very least, they raised serious questions about Soon-Shiong's intent.

"We pretty clearly have an optics problem," said Morey Ward, a tax lawyer with Ropes & Gray who represents tax-exempt organizations.

Soon-Shiong's spokeswoman, Jen Hodson, did not answer a list of emailed questions or return calls from STAT. Soon-Shiong has denied STAT's repeated requests for an interview dating back to last fall.

The University of Utah put STAT on the phone with a geneticist whose team is using data generated by the deal for research, and answered additional questions by email. The university confirmed that it concluded it had to use the vast bulk of Soon-Shiong's donation to buy sequencing from his company but said the resulting research was fruitful.

"My first reaction was surprise that the University of Utah lawyers agreed to sign this," said Brian Galle, a Georgetown University law professor who specializes in tax law and the law of nonprofit organizations, and who suspected the arrangement constitutes indirect self-dealing. (University of Utah spokeswoman Julie Kiefer said the university's counsel reviewed both contracts.)

**Questions about a crucial product**

STAT's reporting also raised questions about whether Soon-Shiong's signature GPS Cancer diagnostic, which is crucial to his core business, is making headway in the market.

NantHealth, the Soon-Shiong company that markets GPS Cancer, appears to have misled investors in reporting its third-quarter earnings last November. The company said that during the quarter it had received 524 orders for the GPS Cancer test, which analyzes tumor genetics and recommends treatments for patients. One-third of those orders came from the University of Utah deal, a company representative told investors on the earnings call.

But both Kiefer and the geneticist leading the research told STAT that the work they ordered from NantHealth had nothing to do with GPS Cancer. They paid for straightforward genetic sequencing, meant strictly for preclinical research. The geneticist, Deborah Wood Neklason, said she could not understand why NantHealth would count the work as orders for GPS Cancer.

(In the same earnings call, NantHealth did make a point of telling investors that it wasn't counting money from the University of Utah as revenue, which tax law experts said was appropriate since the university

was using money from Soon-Shing's big donation to pay for the sequencing.)

42.     On this news, NantHealth's share price fell $1.67 per share, or 23.3%, to close at $5.50 per share on March 6, 2017—which amounted to a 60% decline from the IPO price of $14.00 per share.

## CLASS ACTION ALLEGATIONS

43.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all those who purchased or otherwise acquired NantHealth securities: (1) pursuant and/or traceable to the Company's Registration Statement issued in connection with the Company's IPO on or about June 1, 2016, seeking to pursue remedies under the Securities Act; and/or (2) between June 1, 2016, and March 6, 2017, inclusive, seeking to pursue remedies under the Exchange Act; and were damaged thereby (collectively, the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

44.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, NantHealth's securities were actively traded on the Nasdaq Stock Market (the "NASDAQ").  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds

or thousands of members in the proposed Class.  Millions of NantHealth shares were traded publicly during the Class Period on the NASDAQ.    Record owners and other members of the Class may be identified from records maintained by NantHealth or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

45.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

46.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

47.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of NantHealth ; and

(c)   whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

48.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

49.   The market for NantHealth's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, NantHealth's securities traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired NantHealth's securities relying upon the integrity of the market price of the Company's securities and market information relating to NantHealth, and have been damaged thereby.

50.   During the Class Period, Defendants materially misled the investing public, thereby inflating the price of NantHealth's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  Said statements and omissions were materially false and/or misleading

in that they failed to disclose material adverse information and/or misrepresented the truth about NantHealth's business, operations, and prospects as alleged herein.

51. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about NantHealth's financial well-being and prospects. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## LOSS CAUSATION

52. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

53. During the Class Period, Plaintiff and the Class purchased NantHealth's securities at artificially inflated prices and were damaged thereby. The price of the Company's securities significantly declined when the

misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

### SCIENTER ALLEGATIONS

54.    As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.   As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding NantHealth, his/her control over, and/or receipt and/or modification of NantHealth's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning NantHealth, participated in the fraudulent scheme alleged herein.

### APPLICABILITY OF PRESUMPTION OF RELIANCE
### (FRAUD-ON-THE-MARKET DOCTRINE)

55.    The market for NantHealth's securities was open, well-developed and efficient at all relevant times.   As a result of the materially false and/or misleading statements and/or failures to disclose, NantHealth's securities traded at artificially

inflated prices during the Class Period.  On June 8, 2016, the Company's stock closed at a Class Period high of $15.80 per share.  Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of NantHealth's securities and market information relating to NantHealth, and have been damaged thereby.

56.   During the Class Period, the artificial inflation of NantHealth's stock was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about NantHealth's business, prospects, and operations.   These material misstatements and/or omissions created an unrealistically positive assessment of NantHealth and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company stock.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

57.   At all relevant times, the market for NantHealth's securities was an efficient market for the following reasons, among others:

(a)     NantHealth stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)     As a regulated issuer, NantHealth filed periodic public reports with the SEC and/or the NASDAQ;

(c)     NantHealth regularly communicated with public investors *via* established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)     NantHealth was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.   Each of these reports was publicly available and entered the public marketplace.

58.     As a result of the foregoing, the market for NantHealth's securities promptly digested current information regarding NantHealth from all publicly available sources and reflected such information in NantHealth's stock price. Under these circumstances, all purchasers of NantHealth's securities during the Class Period suffered similar injury through their purchase of NantHealth's securities at artificially inflated prices and a presumption of reliance applies.

59.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.   Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

60.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is

determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of NantHealth who knew that the statement was false when made.

## FIRST CLAIM
### Violation of Section 11 of The Securities Act
### (Against the Section 11 Defendants)

61.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness or intentional misconduct.

62.     This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of the Class, against the Section 11 Defendants.

63.     The Registration Statement for the IPO was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

64.     NantHealth is the registrant for the IPO.  The Section 11 Defendants named herein were responsible for the contents and dissemination of the Registration Statement.

65.   As issuer of the shares, NantHealth is strictly liable to Plaintiff and the Class for the misstatements and omissions.

66.   None of the Section 11 Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

67.   By reasons of the conduct herein alleged, each Section 11 Defendant violated, and/or controlled a person who violated Section 11 of the Securities Act.

68.   Plaintiff acquired NantHealth shares pursuant and/or traceable to the Registration Statement for the IPO.

69.   Plaintiff and the Class have sustained damages.   The value of NantHealth common stock has declined substantially subsequent to and due to the Section 11 Defendants' violations.

## SECOND CLAIM
### Violation of Section 15 of The Securities Act
### (Against the Section 11 Individual Defendants)

70.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness or intentional misconduct.

71.   This count is asserted against the Section 11 Individual Defendants and is based upon Section 15 of the Securities Act.

72.    The Section 11 Individual Defendants, by virtue of their offices, directorship, and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of NantHealth within the meaning of Section 15 of the Securities Act.  The Section 11 Individual Defendants had the power and influence and exercised the same to cause NantHealth to engage in the acts described herein.

73.    The Section 11 Individual Defendants' positions made them privy to and provided them with actual knowledge of the material facts concealed from Plaintiff and the Class.

74.    By virtue of the conduct alleged herein, the Section 11 Individual Defendants are liable for the aforesaid wrongful conduct and are liable to Plaintiff and the Class for damages suffered.

**THIRD CLAIM**
**Violation of Section 10(b) of The Exchange Act and**
**Rule 10b-5 Promulgated Thereunder**
**(Against the Company and the Individual Defendants)**

75.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

76.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) caused Plaintiff and other members of the Class to purchase

NantHealth's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

77.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for NantHealth's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

78.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about NantHealth's financial well-being and prospects, as specified herein.

79.     These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of NantHealth's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of

material facts and/or omitting to state material facts necessary in order to make the statements made about NantHealth  and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

80.    Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

81.    The defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing NantHealth's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities.    As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

82.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of NantHealth's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public

statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired NantHealth's securities during the Class Period at artificially high prices and were damaged thereby.

83.    At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that NantHealth was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their NantHealth  securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

84.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

85.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

### FOURTH CLAIM
### Violation of Section 20(a) of The Exchange Act
### (Against the Individual Defendants)

86.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

87.   The Individual Defendants acted as controlling persons of NantHealth within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

88.   In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

89.   As set forth above, NantHealth and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual

Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

### **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

DATED:  March 7, 2017

**GLANCY PRONGAY & MURRAY LLP**

By: *s/ Robert V. Prongay*
Lionel Z. Glancy
Robert V. Prongay
Lesley F. Portnoy
Charles H. Linehan
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone:  (310) 201-9150
Facsimile:   (310) 201-9160
Email:        rprongay@glancylaw.com

*Attorneys for Plaintiff*

## SWORN CERTIFICATION OF PLAINTIFF

## NANTHEALTH, INC. SECURITIES LITIGATION

I, Atul Singh Deora, individually, and/or in my capacity as trustee and/or principal for accounts   listed on Schedule A, certify that:

1.      I have reviewed the Complaint and authorize its filing and/or the filing of a Lead Plaintiff motion on my behalf.

2.      I did not purchase **NANTHEALTH, INC.,** the security that is the subject of this action, at the direction of plaintiff's counsel or in order to participate in any private action arising under this title.

3.      I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4.      My transactions in **NANTHEALTH, INC.** during the Class Period set forth in the Complaint are as follows:

         (See attached transactions)

5.      I have not served as a representative party on behalf of a class under this title during the last three years, except for the following:

6.      I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court, including the award to a representative plaintiff of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury that the foregoing are true and correct statements.

3/7/2017
_____
Date

DocuSigned by:

*Atul Singh Deora*
_____
031E23E2C04E4D5...

           Atul Singh Deora

**Atul Singh Deora's Transactions in NantHealth, Inc. (NH)**

| Date | Transaction Type | Quantity | Unit Price |
|------|------------------|----------|------------|
| 01/03/2017 | Bought | 255 | $9.6800 |
| 02/01/2017 | Bought | 200 | $7.7100 |
| 03/03/2017 | Bought | 470 | $7.1700 |