1   Eric H. Gibbs (Bar # 178658)
2   David Stein (Bar # 257465)
3   Amanda M. Karl (Bar # 301088)
    **GIBBS LAW GROUP LLP**
4   ehg@classlawgroup.com
5   ds@classlawgroup.com
    amk@classlawgroup.com
6   505 14th Street, Suite 1110
7   Oakland, CA 94612-1406
    Telephone: (510) 350-9700
8   Facsimile: (510) 350-9701
9
    John A. Kehoe
10  **KEHOE LAW FIRM, P.C.**
11  jkehoe@kehoelawfirm.com
    Two Penn Center Plaza
12  1500 JFK Boulevard, Suite 1020
13  Philadelphia, PA 19102
    Telephone: (215) 792-6676
14

15  *Counsel for Co-Lead Plaintiffs and Lead Counsel for the Class*

16              **UNITED STATES DISTRICT COURT**
                **CENTRAL DISTRICT OF CALIFORNIA**
17                   **WESTERN DIVISION**
18

| | |
|---|---|
| 19  ATUL SINGH DEORA, Individually and on Behalf of All Others Similarly 20  Situated,<br><br>                    Plaintiff,<br>21<br>        vs.<br>22  NANTHEALTH, INC., PATRICK 23  SOON-SHIONG, PAUL A. HOLT, MICHAEL S. SITRICK, KIRK K. 24  CALHOUN, MARK BENNETT, EDWARD MILLER, MICHAEL 25  BLASZYK, JEFFERIES LLC, FIRST ANALYSIS SECURITIES 26  CORPORATION, CANACCORD GENUITY INC., and FBR CAPITAL 27  MARKETS & CO.,<br>28<br>                    Defendants. | Case No. 2:17-cv-01825-BRO-MRW<br><br>CLASS ACTION<br><br>**AMENDED CONSOLIDATED CLASS ACTION COMPLAINT** |

| | |
|---|---|
| MICHAEL DI RIENZO, Individually and on Behalf of All Others Similarly situated, | Case No. 2:17-cv-01912-BRO-MRW |
| Plaintiff, | CLASS ACTION |
| vs. | |
| NANTHEALTH, INC., PATRICK SOON-SHIONG, and PAUL A. HOLT, | |
| Defendants. | |
| JOHN SHAFIK, Individually and on Behalf of All Others Similarly Situated, | Case No. 2:17-cv-01940-BRO-MRW |
| Plaintiff, | CLASS ACTION |
| vs. | |
| NANTHEALTH, INC., PATRICK SOON-SHIONG, PAUL A. HOLT, MICHAEL S. SITRICK, KIRK K. CALHOUN, MARK BURNETT, EDWARD MILLER, MICAHEL BLASZYK, JEFFERI LLC, COWEN AND COMPANY, LLC, FIRST ANALYSIS SECURITEIS CORPORATION, CANNACROD GENUITY INC., and FBR CAPITAL MARKETS & CO., | |
| Defendants. | |

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 2:17-cv-01825-BRO-MRW

# TABLE OF CONTENTS

Page

NATURE OF ACTION .................................................................. 1

JURISDICTION AND VENUE ...................................................... 4

PARTIES .......................................................................................... 4

CLASS ACTION ALLEGATIONS .............................................. 5

GENERAL BACKGROUND .......................................................... 9

    I.    Soon-Shiong, NantHealth, and GPS Cancer .......................... 9

    II.    The Soon-Shiong Entities' Agreements with the University
        of Utah ............................................................................... 11

        A.    The September 2014 Memorandum of Understanding ................ 11

        B.    The September 2014 Gift Agreement ............................................ 12

        C.    The January 2015 Services Agreement ......................................... 13

VIOLATIONS OF THE SECURITIES ACT .............................. 14

    I.    NantHealth's IPO and Sale of Securities ............................ 14

    II.    NantHealth's Offering Materials Omitted and Misrepresented Key
        Facts Relating to the Agreements with the University of Utah ........ 15

        A.    The Offering Materials' Statements Relating to the Agreements
            with the University of Utah ............................................................ 15

VIOLATIONS OF THE EXCHANGE ACT ...................................... 20

    I.    Perpetuating the University of Utah Agreements Myth and
        Overstating the Success of GPS Cancer Through False and
        Misleading Statements ...................................................... 20

    II.    Notes Issuance ................................................................... 29

    III.    Truth Revealed .................................................................. 29

i

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 2:17-cv-01825-BRO-MRW

PRESUMPTION OF RELIANCE WITH RESPECT TO THE EXCHANGE
ACT CLAIMS ........................................................................ 36

INAPPLICABILITY OF STATUTORY SAFE HARBOR ................................. 38

CAUSES OF ACTION UNDER THE SECURITIES ACT............................... 39

CAUSES OF ACTION UNDER THE EXCHANGE ACT ................................. 44

PRAYER FOR RELIEF ...................................................................... 47

DEMAND FOR JURY TRIAL .............................................................. 48

ii

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 2:17-cv-01825-BRO-MRW

Plaintiffs Southeastern Pennsylvania Transportation Authority ("SEPTA") and Michael Fontaine (together "Plaintiffs") bring claims arising under the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77k *et seq.*, individually and on behalf of all persons and entities who purchased NantHealth Inc.'s ("NantHealth" or "Company") common stock in or traceable to the Company's initial public offering on or around June 1, 2016 (the "IPO"), and were damaged thereby. Separately, Plaintiffs bring claims arising under Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j *et seq.*, individually and on behalf of all persons and entities who purchased or otherwise acquired NantHealth securities, including common stock, bonds, notes, and call options, and/or who sold put options between June 1, 2016, and May 1, 2017, inclusive (the "Class Period"), and who were damaged thereby.

Plaintiffs' allegations are based on personal knowledge as to themselves and their actions, and upon information and belief as to all other matters. Plaintiffs' information and belief is based on, *inter alia*, the investigation of their undersigned counsel, which included, *inter alia*, the review of press releases, analyst reports, media reports, conference call transcripts, and filings with the United States Securities and Exchange Commission ("SEC"). Plaintiffs' investigation into the factual allegations contained herein is continuing, and many of the facts related to Plaintiffs' allegations are known only by NantHealth and the Defendants named herein, or are exclusively within their custody or control. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF ACTION

1.     Just one year ago, NantHealth, a company that claims to provide genome analysis and gene sequencing software, raised approximately $91 million through an IPO that occurred pursuant to a registration statement and prospectus

1

(the "Offering Materials") that contained materially misleading information and omitted material facts regarding demand for its services, especially its critical "GPS Cancer Solution" platform, and senior executives continued to perpetuate the misrepresentations in the periods that followed the IPO.

2.      The Offering Materials and post-offering statements contained untrue statements of material fact and omitted material information because, among other things, the Offering Materials failed to disclose the true nature of the relationship between NantHealth and the University of Utah (the "University") that was material to NantHealth's business prospects and reported success.  In September 2014, several entities controlled by NantHealth's founder and CEO, Patrick Soon-Shiong ("Soon-Shiong"), entered into agreements with the University through which various nonprofits that Soon-Shiong controlled provided $12 million to the University in an ostensible donation, with $10 million earmarked for health-related research.

3.      Contrary to reality, the Offering Materials stated that the University was *not* obligated to retain NantHealth and pay it for the research services, and instead created a misleading portrait that the University had entered the marketplace and independently selected NantHealth as the best qualified entity to perform the research.  Unbeknownst to investors, before receiving the donation, the University entered a memorandum of understanding with entities controlled by Soon-Shiong (the "MOU") that, in effect, assured that the University would select NantHealth as the facility to perform those research services. Specifically, and undisclosed to NantHealth investors, the MOU gave NantHealth "the right" to conduct "any or all" of the research.   And the separate donation agreement contained highly restrictive terms that effectively made it impossible for any entity other than NantHealth to qualify for eligibility to perform the research.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 2:17-cv-01825-BRO-MRW

4.     Relatedly, during the Class Period NantHealth made false and misleading statements that there was significant commercial demand for its GPS Cancer service – which purported to provide an analysis of a patient's genes in order to suggest which cancer treatments might be the most effective.  These statements included ones that the University had engaged NantHealth to perform a significant number of such tests, and that NantHealth had a large number of additional paying customers for such tests.

5.     By mid-2017, however, news began to surface concerning the true nature of the agreements between the Soon-Shiong-controlled entities and the University of Utah, leading to widespread condemnation.  *STAT*, a leading health and medicine publication, was highly critical of the arrangement, and referenced multiple tax experts interviewed by *STAT* who agreed the arrangement appeared to violate federal tax rules, amounting to indirect self-dealing.

6.     As other prominent authorities began to question the nature of the relationship between the University and NantHealth, the true demand (or lack thereof) for NantHealth products, including GPS Cancer, began to surface.  The University admitted that it had not engaged NantHealth to perform GPS Cancer tests, and the Company was confronted with evidence that few if any third parties were actually paying for the GPS Cancer testing that Defendants had touted.  In response, the value of NantHealth securities plummeted, with the common stock price falling from $11.17 on November 7, 2016, to $2.98 on May 1, 2017 (the last day of the Class Period).

7.     As a result of Defendants' Securities Act and Exchange Act violations, Plaintiffs and other Class members have suffered significant losses and damages.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 2:17-cv-01825-BRO-MRW

1

## JURISDICTION AND VENUE

2

8.    This Court has jurisdiction and venue over the subject matter of this

3

action pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v, Section 27 of

4

the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.

5

9.    Venue is proper in this District pursuant to Section 22 of the

6

Securities Act, 15 U.S.C. § 77v, Section 27 of the Exchange Act, 15 U.S.C. §

7

78aa, and 28 U.S.C. § 1391(b), (c), and (d).  Many of the acts and transactions

8

described in this Complaint, including the preparation and dissemination of

9

materially false and misleading public filings, occurred in this District.  At all

10

relevant times, NantHealth's headquarters and principal offices were located in

11

this District.

12

10.    In connection with the acts alleged in this Complaint, Defendants

13

used the means and instrumentalities of interstate commerce, including the United

14

States mail, interstate telephone communications, and the facilities of the national

15

securities exchanges.

16

## PARTIES

17

11.    Court-appointed Lead Plaintiff SEPTA is an institutional investor

18

with approximately $1.1 billion in assets under management that provides pension

19

benefits to more than 13,000 beneficiaries.  As set forth in a certification that

20

SEPTA previously filed with the Court, SEPTA acquired securities purchased in

21

or traceable to the IPO and was damaged thereby.

22

12.    Court-appointed Lead Plaintiff Michael Fontaine ("Fontaine")

23

purchased NantHealth common stock during the Class Period and was damaged

24

thereby, as set forth in a certification that Fontaine previously filed with the Court.

25

13.    Defendant NantHealth, Inc. is a Delaware corporation with its

26

principal executive offices located in Culver City, California.

27

28

4

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 2:17-cv-01825-BRO-MRW

14.     Defendant Patrick Soon-Shiong was, at all relevant times, NantHealth's CEO and Chairman of the Board of Directors.  Soon-Shiong signed the Registration Statement.

15.     Defendant Paul Holt ("Holt") was, at all relevant times, NantHealth's Chief Financial Officer.  Holt signed the Registration Statement.

16.     Defendant Michael S. Sitrick ("Sitrick") was a director of NantHealth at the time of the IPO and he signed the Registration Statement.

17.     Defendant Kirk K. Calhoun ("Calhoun") was a director of NantHealth at the time of the IPO and he signed the Registration Statement.

18.     Defendant Mark Burnett ("Burnett") was a director of NantHealth at the time of the IPO and he signed the Registration Statement.

19.     Defendant Edward Miller ("Miller") was a director of NantHealth at the time of the IPO and he signed the Registration Statement.

20.     Defendant Michael Blaszyk ("Blaszyk") was a director of NantHealth at the time of the IPO and he signed the Registration Statement.

21.     Soon-Shiong, Sitrick, Calhoun, Burnett, Miller and Blaszyk are hereafter referred to as the "Director Defendants."

22.     Soon-Shiong and Holt are hereafter referred to as the "Officer Defendants," and the Officer Defendants, Director Defendants and NantHealth are collectively referred to as the "Defendants."

## CLASS ACTION ALLEGATIONS

23.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3).  Plaintiffs bring claims arising under the Securities Act on behalf of themselves and all other persons and entities who purchased or acquired NantHealth common stock in or traceable to the IPO ("Securities Act Class").  Plaintiffs also bring claims arising under the Exchange Act on behalf of themselves and all other persons and entities who purchased any

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 2:17-cv-01825-BRO-MRW

securities, including, bonds, notes, and call options, and/or who sold NantHealth put options, between June 1, 2016, and May 1, 2017 ("Exchange Act Class"). Excluded from both Classes are (i) Defendants, (ii) the officers and directors of each Defendant, (iii) any entity in which Defendants have or had a controlling interest, (iv) members of Defendants' immediate families and the legal representatives, heirs, successors or assigns of any such excluded party, and (v) any judge presiding over this matter, his or her spouse, and all persons within the third degree of relationship to either of them and the spouse of such persons.

24. **Commonality and Predominance**: Common questions of law and fact exist as to all members of each Class and predominate over any questions solely affecting individual members of each Class. For the Securities Act Class, these common questions include whether:

      a. The federal securities laws were violated by Defendants' acts and omissions as alleged;

      b. The Offering Materials were materially misleading or omitted material information; and

      c. Members of the Securities Act Class have sustained damages (and, if so, what the proper measure of damages should be).

For the Exchange Act Class, these common questions include whether:

      a. The federal securities laws were violated by Defendants' acts and omissions as alleged;

      b. Documents, press releases, and other statements disseminated to the investing public and the Company's shareholders misrepresented and omitted material facts about the business and financial condition of NantHealth;

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 2:17-cv-01825-BRO-MRW

c.   The market price of NantHealth's securities was artificially inflated due to the material representations and failures to disclose material facts as described in this Complaint; and

d.   Whether members of the Exchange Act Class have sustained damages (and, if so, what the proper measure of damages should be).

25.   **Numerosity**: The members of each Class are so numerous that joinder of all members is impracticable.   While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are thousands of class members located throughout the United States.   Throughout the Class Period, the NantHealth securities at issue traded in an efficient market.   Record owners and other members of each Class may be identified from records maintained by NantHealth or its transfer agents and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

26.   **Typicality**: Plaintiffs' claims are typical of the claims of the other members of each Class as all members of each Class were similarly affected by Defendants' wrongful conduct in violation of federal law as described in this Complaint.

27.   **Adequacy**: Plaintiffs will fairly and adequately protect the interests of the members of each Class because their interests do not conflict with the interests of the members of the class they seek to represent.   Plaintiffs have retained counsel competent and experienced in class and securities litigation.

28.   **Superiority**: A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.   Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 2:17-cv-01825-BRO-MRW

1    litigation make it impossible for members of each Class to individually redress the

2    wrongs done to them.    Even if class members themselves could afford such

3    individualized litigation, the court system could not.    In addition to the burden and

4    expense of managing many actions arising from this issue, individualized

5    litigation presents a potential for inconsistent or contradictory judgments.

6    Individualized litigation increases the delay and expense to all parties and the

7    court system presented by the legal and factual issues of the case.    By contrast, a

8    class action presents far fewer management difficulties and provides the benefits

9    of single adjudication, economies of scale, and comprehensive supervision by a

10   single court.    There will be no difficulty in the management of this suit as a class

11   action.

12          29.    In the alternative, each proposed class may be certified because:

13                 a.    The prosecution of separate actions by the individual members of

14                       each proposed class would create a risk of inconsistent adjudications,

15                       which could establish incompatible standards of conduct for

16                       Defendants;

17                 b.    The prosecution of individual actions could result in adjudications,

18                       which, as a practical matter, would be dispositive of the interests of

19                       non-party class members or which would substantially impair their

20                       ability to protect their interests; and

21                 c.    Defendants have acted or refused to act on grounds generally

22                       applicable to each proposed class, thereby making appropriate final

23                       and injunctive relief with respect to the members of the proposed

24                       class as a whole.

25

26

27

28

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 2:17-cv-01825-BRO-MRW

## GENERAL BACKGROUND

**I.      Soon-Shiong, NantHealth, and GPS Cancer**

30.     Patrick Soon-Shiong is a doctor turned billionaire businessman, who controls a sprawling network of companies and nonprofits, including at least twenty-three current and former for-profit companies.

31.     Soon-Shiong-controlled entities reportedly focus on "software, genomic and protein tests, and cancer immunotherapy drugs."

32.     Three of Soon-Shiong's nonprofits and two of his companies are particularly relevant to this lawsuit: (i) Soon-Shiong was at all relevant times the CEO of the Chan Soon-Shiong Family Foundation, the Chan Soon-Shiong NantHealth Foundation, and the Chan Soon-Shiong Institute of Molecular Medicine, all nonprofits; and (ii) Soon-Shiong is the Chairman of the Board of Directors and CEO of NantHealth and the CEO and Founder of NantOmics.

33.     NantHealth reportedly sells software solutions capable of tracking large-scale healthcare data, and provides services related to systems that purportedly make diagnosis and treatment more precise.

34.     NantHealth's predecessor company, About Advanced Health, LLC, was founded in 2010 as a Delaware limited liability, and subsequently changed its name to NantHealth, LLC.  In connection with the IPO, NantHealth, LLC became NantHealth, Inc. on June 1, 2016.

35.     NantOmics offers testing capabilities that provide medical profiles of individual patients' cancers.  It maintains several accredited and licensed laboratories around the country.

36.     In May 2016, NantHealth entered into a reseller agreement with NantOmics through which it obtained exclusive access and sales rights to GPS Cancer, a product central to NantHealth's business model.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 2:17-cv-01825-BRO-MRW

37.    The "GPS" in GPS Cancer is an acronym for Genomic Proteomic Spectrometry.  According to NantHealth, GPS Cancer aims to diagnose cancer "at the molecular level by measuring the whole genome and proteome of a patient and thereby potentially predicting the patient's response and resistance to particular therapies."   Such analysis reportedly provides in-depth information about the cancer's specific phenotype and expression as well as drug efficacy, which may in turn impact treatment decisions.

38.    The success and demand for the GPS Cancer platform is material to NantHealth's investors and has long been intertwined with the Company's overall financial prospects and future performance, and thus it is highlighted throughout NantHealth's Offering Materials.

39.    For example, in an 8-page Prospectus summary, GPS Cancer is referenced 17 times, including in 1 of only 2 total images in the summary—a half-page, color image entitled "What is GPS Cancer."   The Prospectus repeatedly touts NantHealth's goal of becoming "the leading evidence-based, personalized healthcare company," and consistently cites GPS Cancer as the means to achieve that goal.  The Prospectus also contains a section entitled "Key Factors Affecting Our Performance."   The first key factor is "Commercialize and Expand the Adoption of Our GPS Cancer Solution," including by educating cancer professionals and patients:

> ***Our performance depends on our ability to drive adoption of GPS Cancer and reimbursement at levels that are profitable*** . . . GPS Cancer is the only comprehensive and commercially available clinical cancer platform incorporating and integrating whole genome (comparing both a patient's normal and tumor tissue), RNA, proteomic and molecular pathways information into a clinical report that analyzes this data and identifies actionable targets and potential treatment decisions.  We believe the potential market for GPS Cancer is significant.   We are increasing recognition of GPS Cancer by engaging and educating oncologists, cancer patients, patient advocacy

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 2:17-cv-01825-BRO-MRW

groups and other key oncology stakeholders and pursuing reimbursement.

(Emphasis added.)

40.     Quarterly statements, press releases, and analyst reports following NantHealth's IPO also characterized the demand for and sales and deliveries of GPS Cancer as vital for NantHealth's overall financial prospects.

## II.     The Soon-Shiong Entities' Agreements with the University of Utah

41.     In late 2014 and early 2015, well before NantHealth's IPO, several entities controlled by Soon-Shiong entered into a series of highly suspect agreements with the University of Utah.

42.     Per the agreements, Soon-Shiong-controlled nonprofits would pay the University $12 million, ostensibly as a charitable donation, and, unbeknownst to investors, the University was, in effect, required to purchase $10 million in research services from NantHealth, Soon-Shiong's for-profit company.

### A.     The September 2014 Memorandum of Understanding

43.     Soon-Shiong himself, or one or more of his controlled entities, entered into the MOU with the University of Utah in early September 2014.

44.     At that time, Soon-Shiong and the University were discussing the ostensible $12 million charitable donation by Soon-Shiong entities to the University that would allow the University to retain and pay one or more third parties to perform $10 million worth of research services as part of a project that would be known as the "Heritage 1K project."

45.     Before formalizing an agreement for the $12 million donation, the University and Soon-Shiong, or entities he controlled, executed the MOU, pursuant to which a Soon-Shiong-owned business (NantHealth) would have the right to perform all of the research services.  Specifically, "Donor-affiliated Scientists shall have the right to analyze the sequence data for any or all of the Heritage 1K project."

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 2:17-cv-01825-BRO-MRW

46.   The MOU also required that genetic analysis be carried out "by a bioinformatics team associated with the Donor [*i.e.*, Soon-Shiong]."

**B.    The September 2014 Gift Agreement**

47.   In September 2014, following the MOU, three Soon-Shiong nonprofits executed an agreement (the "Gift Agreement") with the University of Utah, pursuant to which they donated $12 million to the University.

48.   The Gift Agreement made no reference to the MOU.

49.   Per the Gift Agreement, the three nonprofits that collectively donated the $12 million were the Chan Soon-Shiong Family Foundation, the Chan Soon-Shiong NantHealth Foundation, and the Chan Soon-Shiong Institute of Molecular Medicine.

50.   As CEO of all three nonprofits, Soon-Shiong executed the Gift Agreement on their behalves.

51.   Per the Gift Agreement, the University agreed to use the $12 million for "whole genome, exome, RNA sequencing and analysis of approximately 1,000 individuals distributed among Utah families affected by a variety of rare and common diseases and other phenotypes relevant to health such as chronic lymphocytic leukemia, prostate cancer, diabetes mellitus, amyotrophic lateral sclerosis (Lou Gehrig's disease), healthy aging/longevity, and other diseases."

52.   Per the Gift Agreement, $10 million of the $12 million donation could be used to pay one or more third parties to analyze the patient data.

53.   The Gift Agreement required that, in order to be selected by the University to perform the research, the third party would have to satisfy several very specific criteria:

In performing the research, ***University may contract with non-University entities (an "Omics Facility") for the performance of the Omics Analyses*** or other work in connection with the Project.  Any such Omics Facility will comply with the highest quality, research-

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 2:17-cv-01825-BRO-MRW

grade sequencing available at time of the Gift, and University will make all efforts to ensure that the ***highest standards*** are met, including germline WGS (60 x coverage) on all samples, cancer and somatic WGS (60 x coverage) and WES for all cancer-related samples, and whole exome sequencing or RNA-Seq (three replicates) for selected samples as technically necessary or desired . . . For Project samples, University will expect the Omics Facility or Facilities to perform the following functions: WGS, WES, RNA-seq (total and poly-a), and HIPAA-secured transport of sequence data to analysis machines for quality control, variant calling and variant annotation (e.g., determining if a given variant induces an amino acid change), and that these will be presented in a complete report including annotated VCF files to Heritage 1K Scientists at the University within a total of seven to ten (7-10) business days from the time of receipt of sample (it being understood and agreed that the 7-10 business day time frame is in the course of performing Omics Analysis on 1,000 samples over a period of 12 months).

(Emphasis added.)

## C.    The January 2015 Services Agreement

54.    In January 2015, about four months after the Gift Agreement was executed, NantHealth, LLC (NantHealth's predecessor) and the University of Utah executed another agreement (the "Services Agreement").

55.    The Services Agreement did not refer to the MOU.

56.    Through the Services Agreement, the University contracted with NantHealth to provide the $10 million worth of research services that had been contemplated in both the MOU and the Gift Agreement.

57.    The Services Agreement stated that the "University requires the services of a genomics sequencing facility to perform certain genomics sequencing and analyses using samples provided by the University," and that NantHealth "has the facilities, equipment and qualified personnel necessary to perform the services required by the University."

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 2:17-cv-01825-BRO-MRW

58.     The Services Agreement describes the scope of services to be performed in language similar to the Gift Agreement's description of work that an outside research facility could be paid to perform with the donation funds:

> Facility agrees to perform comprehensive whole genome sequencing ("WGS"), whole exome sequencing (WES), RNA-Seq, and analyses (the "Omics Analyses" or "Services"), as requested from time to time by the University . . . the parties anticipate that the University will require Omics Analyses on approximately 1,000 individuals, and on some number of matched somatic samples, to be determined on an Initiative-by-Initiative basis in collaboration with the scientific staff of Facility . . . Turn-around-time for delivery of the [complete report] shall be approximately seven to ten (7-10) business days from Facility's receipt of sample, assuming a volume of not more than 100 samples per month.

59.     Following execution of the Services Agreement, NantHealth performed the specified research services, for which the University of Utah has paid NantHealth millions of dollars.

## VIOLATIONS OF THE SECURITIES ACT

60.     Plaintiffs' Securities Act claims are based on strict liability and negligence and are not based on any allegation that Defendants engaged in fraud or any other deliberate or intentional misconduct.   For the purposes of their Securities Act claims, Plaintiffs specifically disclaim any reference to or reliance on fraud allegations.

61.     The Securities Act claims are brought on behalf of the Securities Act Class.

## I.     NantHealth's IPO and Sale of Securities

62.     On May 6, 2016, NantHealth filed with the SEC on Form S-1 a registration statement and prospectus for the IPO of NantHealth common stock, signed by Defendants Soon-Shiong and Holt and the Director Defendants (the

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 2:17-cv-01825-BRO-MRW

"Registration Statement"). The preliminary prospectus was "not complete and may be changed."

63. The final Prospectus filed with the SEC concerning this IPO was dated June 1, 2016, which is the "effective date" of the registration statement for purposes of Section 11 liability under 17 C.F.R. § 230.415 and 17 C.F.R. § 229.512(a)(2).

64. Together, the Registration Statement and the Prospectus dated June 1, 2016, constitute the IPO's "Offering Materials."

65. The IPO offered 6,500,000 shares of common stock at $14.00 per share. NantHealth granted the underwriters an option to purchase up to an additional 975,000 shares of common stock.

66. The Offering Materials stated that neither NantHealth nor the underwriters authorized "anyone to provide any information or to make any representations other than those contained in [the Final P]rospectus."

67. The Offering Materials also stated that 120,732,690 shares of common stock would be "outstanding" after the IPO.

68. Through the IPO, NantHealth raised net proceeds of approximately $83.2 million. 6,900,000 shares were ultimately sold, which includes the underwriters' exercise of the option to buy 400,000 additional shares.

## II.    NantHealth's Offering Materials Omitted and Misrepresented Key Facts Relating to the Agreements with the University of Utah

### A.    The Offering Materials' Statements Relating to the Agreements with the University of Utah

69. NantHealth's Offering Materials materially misstated terms of the MOU, Gift Agreement, and Services Agreement, and omitted material information necessary for Plaintiffs and NantHealth investors to understand the true nature of

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 2:17-cv-01825-BRO-MRW

the relationship with the University and demand for NantHealth's GPS Cancer platform that was material to the Company's business.

70.     The Offering Materials discuss the agreements as they pertain to NantHealth to the following extent only:

> We expect to launch our commercial sequencing and molecular analysis solution, or GPS Cancer, in the second quarter of 2016.  In January 2015, we entered into an agreement to provide certain research related sequencing services to a university which is engaged in researching the genetic causes of certain hereditary diseases.  The agreement provides for the university to pay us $10.0 million in exchange for our providing sequencing services through our reseller agreement with NantOmics.  At the university's request, ***certain non-profit organizations provided <u>partial</u> funding for the sequencing and related bioinformatics costs associated with the project***.  Our Chairman and Chief Executive Officer serves as a member of the board of directors and may have significant influence or control over these organizations.  ***The <u>university was not contractually or otherwise required</u> to use our molecular profiling solution or any other products or services as part of the charitable gift***.  In 2015, we provided $6.2 million of services to the university, which has been recorded as a deemed capital contribution instead of revenue due to the reasons described above.  In 2016, we expect to complete another $3.8 million in services which will also be recorded as deemed capital contributions.
>
> * * *
>
> In January 2015, the Company entered into an agreement to provide certain research related sequencing services to a university which is engaged in researching the genetic causes of certain hereditary diseases.  The agreement provides that the university pay the Company $10,000[,000] in exchange for the Company providing sequencing services through its Reseller Agreement with NantOmics.  The Company provided $6,190[,000] of services in 2015 at a cost of approximately $3,714[,000].  At the request of the university, ***certain public and private charitable 501(c)(3) non-profit organizations provided <u>partial</u> funding for the sequencing and related bioinformatics costs associated with the project***. The Company's

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 2:17-cv-01825-BRO-MRW

Chairman and CEO serves as the CEO and a member of the board of directors of each of the organizations and by virtue of these positions he may have influence or control over these organizations. The *university __was not contractually or otherwise required__ to use the Company's molecular profiling solutions or any of the Company's other products or services* as part of the charitable gift. The $6,190[,000] of services performed has been recorded as a deemed capital contribution within Series A members' equity and the costs have been expensed as incurred as other services cost of revenue. The remaining $3,810[,000] in sequencing services will be recorded as a deemed capital contribution within Series A members' equity as services are performed, and any future related costs will be expensed at the same time as the recognition of the capital contribution.

(Emphasis added.)

### 1. The Offering Materials Falsely and Misleadingly Indicated that the University of Utah Was Not Required to Use NantHealth's Research Services.

71.     The Offering Materials falsely and misleadingly stated that the University "was not contractually or otherwise required to use [NantHealth's] molecular profiling solution or any other products or services."

72.     The Offering Materials made no reference to the MOU, and thus failed to disclose that the MOU was formed before the execution of the Gift Agreement and that it expressly required the University to offer a Soon-Shiong business (NantHealth) the opportunity to perform "all of the Heritage 1K project" research services—up to the full $10 million allotted.

73.     The Offering Materials also failed to include the Gift Agreement's language setting forth the exactingly detailed eligibility requirements for any entity desiring to perform the research services, or the tight deadline within which the services had to be performed.

74.     Per a March 6, 2017 article published in *STAT*, "$10 million of his [Soon-Shiong's] donation would be sent right back to one of his companies.  And

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 2:17-cv-01825-BRO-MRW

the contract for his gift was worded in a way that left the University of Utah with no other choice."

75.    Per a *BioSpace* article dated March 8, 2017, Defendant Soon-Shiong himself acknowledged that the University had chosen NantHealth because "it was the only company that met the contract's detailed requirements."

76.    The University confirmed this fact as well.  University spokesperson Julie Kiefer told *The Deseret News* (in an article dated April 27, 2017) that NantHealth was the only facility capable of meeting the Gift Agreement's specifications within "the turnaround time that they required for the project," and that the Gift Agreement contained "very high standards, very state of the art standards."   *The Cancer Letter* also published on April 28, 2017 that the University had concluded "that, at that time, NantHealth was the only facility capable of meeting the state of the art standards and specifications required under the gift agreement."

77.    Hakon Hakonarson, director of the Center for Applied Genomics at the Children's Hospital of Pennsylvania and associate professor of pediatrics at the University of Pennsylvania School of Medicine, examined the language in the Gift Agreement and Services Agreement and commented, as quoted in *The Cancer Letter*'s April 28, 2017 issue: "It is noteworthy that the sequencing metrics his company (NantHealth) is providing are conveniently exactly the same as the stipulations for the required metrics from the facility chosen for the project; so while there is no direct stipulation [in the Gift Agreement] that NantHealth be the sole provider, the stipulation makes it essentially impossible for the University of Utah to do this through a different partner."

78.    The Offering Materials' false and misleading statements and omissions in this regard were material to investors.   The Offering Materials created the impression that there was market demand and future business

prospects for NantHealth services by virtue of the fact that the University had independently selected NantHealth as the best entity in the market to perform the requisite research services for the Heritage 1K Project.  In reality, the University had made no such assessment; it was contractually and otherwise required to offer NantHealth the opportunity to provide the research services.

79.    In addition, by omitting and misrepresenting the details of the MOU, Gift Agreement, and Services Agreement, the Offering Materials understated the future liabilities, decrease in trust in management, and decrease in demand for NantHealth services that would result from potential public exposure of the arrangement.

80.    In a *STAT* article dated March 6, 2017, tax expert Marc Owens stated the arrangement appeared as though Soon-Shiong and NantHealth were "laundering the funds through the University of Utah," and opined, "this transaction was deliberately structured to attempt to disguise self-dealing."  Per the same article, "[f]our tax experts who reviewed the contracts at STAT's request all agreed that the Utah deal was suspicious.  Two said it appeared to violate federal tax rules governing charitable donations, amounting to indirect self-dealing by Soon-Shiong and his foundations."

81.    Paul Wolpe, director of the Emory Center for Ethics and the Asa Griggs Candler Professor of Bioethics, in *The Cancer Letter*'s April 28, 2017 issue, said:

> A grant given to a university for a research project should not use its funds to subcontract with a private company which has a key owner or official affiliated with the fund.  It is clearly a conflict of interest . . . If the grant requires the use of that company, it is an even more egregious conflict of interest.  It is simply inappropriate to have a funder also be a key owner or otherwise significantly affiliated with a private company paid by those funds.  It is, in fact, a kind of "money laundering"—using a university as a conduit to funnel foundation

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 2:17-cv-01825-BRO-MRW

money through a university to a company affiliated with the foundation, formally or through a common owner or a key investor or executive . . . For a company to profit from such a foundation should never be permitted.

> **2. The Offering Materials Falsely and Misleadingly Indicated that the Soon-Shiong Nonprofits Provided Only a Portion of the Funding of the Heritage 1K Project.**

82.     The Offering Materials also falsely and misleadingly stated that certain Soon-Shiong nonprofit organizations provided only "partial" funding for the $10 million of sequencing.

83.     The Offering Materials omitted the fact that, per the Gift Agreement, Soon-Shiong nonprofits had donated the entire $12 million and that the Gift Agreement earmarked $10 million of the donation for expenditure on the research services.

84.     Thus, Soon-Shiong nonprofits did not provide "partial" funding of the $10 million that the University of Utah would pay NantHealth for the research services.  Rather, the Soon-Shiong nonprofits donated the full $10 million.

85.     The Offering Materials' statements and omissions in this regard were material to investors.  The statements and omissions suggested that either the University or some other independent and objective third party was motivated and willing to fund the research services, implying a market demand and future business prospects for NantHealth services.  In reality, however, only Soon-Shiong and his controlled entities were willing to fund the Heritage 1K Project.

## VIOLATIONS OF THE EXCHANGE ACT

### I.     Perpetuating the University of Utah Agreements Myth and Overstating the Success of GPS Cancer Through False and Misleading Statements

86.     In addition to the false and misleading statements and omissions in the Offering Materials described above, NantHealth and the Officer Defendants also made false and misleading statements throughout the Class Period that further

perpetuated the myths that (i) the University had not been required to use NantHealth's research services in the Heritage 1K Project; (ii) the Soon-Shiong-controlled nonprofits provided only a portion of the funding of the Heritage 1K Project; and (iii) that there was demand for NantHealth's critical GPS Cancer product, when there was not.

87.    On July 25, 2016, NantHealth issued a press release (the "7/25/16 Press Release") announcing that NantHealth "has partnered with the University of Utah in analyzing the entire genomic profiles of at least 1,000 individuals who have a history of rare and life-threatening diseases and conditions in their respective families."

88.    The press release also stated the following about the project:

The landmark project will focus on researching the genetic causes of 25 conditions, including, breast, colon, ovarian, and prostate cancers, amyotrophic lateral sclerosis (ALS), chronic lymphocytic leukemia, autism, preterm birth, epilepsy, and other hereditary conditions. Genomic sequencing will be conducted with unique, comprehensive molecular tests offered by NantHealth.

* * *

By carrying out this extensive testing, including analysis of germline and somatic samples, University of Utah and NantOmics researchers will be able to explore the underlying genetic causes of certain conditions and diseases at the cellular level.

* * *

The Heritage 1K Project will expand and focus Utah Genome Project research discovery efforts to help patients prevent, diagnose, and successfully treat diseases that have afflicted their families.

89.    The press release quoted Soon-Shiong as stating, "Understanding the molecular profile and underlying genetic basis of various conditions and diseases,

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 2:17-cv-01825-BRO-MRW

including cancer, will be accelerated through our partnership with the University of Utah and its Utah Genome Project."

90.     The press release also quoted Dr. Vivian S. Lee, CEO of University of Utah Health Care, who added, "By partnering with NantHealth and leveraging the power of genome sequencing, our researchers are now transforming our understanding of common diseases and how they should be treated," and said, "We are pleased to be working with Dr. Soon-Shiong to further expand genetic discovery research under our Utah Genome Project."

91.     NantHealth and the Officer Defendants knew or were reckless in not knowing that the 7/25/16 Press Release furthered the false and misleading impression that the University had freely chosen to use NantHealth's research services in the Heritage 1K Project, which was not true or accurate, but which falsely indicated the existence of market demand and future business prospects for NantHealth services that did not really exist, and which omitted the existence of potential future liabilities and lost business opportunities.

92.     During an August 9, 2016 investor conference call (the "8/9/16 Conference Call"), Robert Watson, NantHealth's President and Chief Growth Officer, explained that NantHealth's "second quarter included a small number of completed GPS Cancer tests" because of the "short window for ordering," but added that "*GPS Cancer orders continue to ramp up into the third quarter*."

93.     During this same call, Soon-Shiong stated, "Yesterday, frankly, I think we broke the record because *we are actually processing 350 whole-genome simultaneously* on our massive parallel computing gear."

94.     In reality, NantHealth and the Officer Defendants knew or recklessly ignored that GPS Cancer orders were not "ramping up" in the third quarter of 2016.  Instead, as was later reported in an April 24, 2017 *Bloomberg* article, discussed below, NantHealth was giving away tests for free.

95.     On August 15, 2016, NantHealth filed its 2016 second quarter results with the SEC on Form 10-Q (the "8/15/16 10-Q"), after the public announcement of its relationship with the University, which told investors:

> In January 2015, the Company entered into an agreement to provide certain research related sequencing services to a university which is engaged in researching the genetic causes of certain hereditary diseases ("the university").   The agreement provides that the university pay the Company $10,000[,000] in exchange for the Company providing sequencing services through the Original Reseller Agreement.
>
> At the request of the university, ***certain public and private charitable 501(c)(3) non-profit organizations provided*** <u>***partial***</u> ***funding for the sequencing and related bioinformatics costs associated with the project***.  The Company's Chairman and CEO serves as the CEO and a member of the board of directors of each of the organizations and by virtue of these positions he may have influence or control over these organizations.   ***The*** <u>***university was not contractually or otherwise required***</u> ***to use the Company's molecular profiling solutions or any of the Company's other products or services as part of the charitable gift***.

(Emphasis added.)

96.     Soon-Shiong and NantHealth's statements on the 8/9/16 Conference Call contained false and misleading statements and omissions in that they exaggerated NantHealth's actual and anticipated third quarter 2016 GPS Cancer-related order numbers, exaggerated the use of and demand for GPS Cancer, a product central to NantHealth's business model, and thus NantHealth's revenues and future business prospects.

97.     The Company and the Officer Defendants knew or were reckless in not knowing that the 8/15/16 10-Q furthered the false and misleading nature of the University relationship by indicating that the University had freely chosen to use NantHealth's research services in the Heritage 1K Project, which was not true or

23

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 2:17-cv-01825-BRO-MRW

accurate, and falsely portrayed existence of market demand and future business prospects for NantHealth services that did not truly exist, and which omitted the existence of potential future liabilities and lost business opportunities.

98.    NantHealth and the Officer Defendants also knew or were reckless in not knowing that the statement furthered the false and misleading impression that the Soon-Shiong-controlled nonprofits provided only "partial" funding of the Heritage 1K Project, suggesting that either the University or some other independent and objective third party was motivated and willing to fund the research services, implying a market demand and future business prospects for NantHealth services.

99.    On November 7, 2016, after the markets closed for trading, NantHealth issued a press release that it filed with the SEC on Form 8-K (the "11/7/16 8-K"), which reported that the Company had received orders for 524 GPS Cancer tests in the third quarter of 2016, and touted the "Rapid Adoption of GPS Cancer . . . with 524 GPS Cancer Tests ordered in Q3." Defendant Holt signed the press release.

100.    During an investor conference call that same afternoon (the "11/7/16 Conference Call"), NantHealth represented that 180 of the 524 GPS Cancer orders came from the University of Utah, and Defendant Soon-Shiong assured investors:

> In the GPS Cancer profile segments of our business, you will see that we have now had rapid adoption of GPS Cancer with more than 100% increase in the number of oncologists ordering the test from the second quarter to the third quarter. We have 524 GPS Cancer orders in the quarter and we've delivered completed reports on 334 of these to date as we're going through the processing.
>
> * * *
>
> Let me turn my attention to GPS cancer. We've clearly made significant progress during this quarter and have learned a lot with regard to a launch of this novel breakthrough product. Of the 524 of

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 2:17-cv-01825-BRO-MRW

GPS Cancer orders in the quarter, 344 were commercial and 180 were ordered under a research agreement with University of Utah, which we announced earlier this year.  We completed more than, as I said, 334 GPS Cancer reports.

101.   Later during the 11/7/16 Conference Call, Robert Watson, NantHealth's President and Chief Growth Officer touted the accelerating GPS Cancer orders, stating that:

GPS orders accelerated in the quarter.  The number of reports delivered in the quarter was 334.  However, revenue recognition was adversely impacted by three issues.  First, the 180 profiles that were completed under the research agreement with the University of Utah were not recognized as revenue because it was considered a research project that was started in advance of the IPO.

102.   But as the Officer Defendants knew, or were reckless in not knowing, the services NantHealth provided to the University did not, in reality, involve any GPS Cancer services.

103.   According to a *STAT* article on March 6, 2017, both Kiefer (the University spokesperson) and the geneticist leading the research, Deborah Wood Neklason, stated that the services the University procured from NantHealth had nothing to do with GPS Cancer.  They said the University had paid for straightforward genetic sequencing.  Neklason also stated that she could not understand why NantHealth would count the work as orders for GPS Cancer.

104.   The following day, on March 7, 2017, *The Los Angeles Times* printed a response by Soon-Shiong.  His response did not reassert that the University had in fact placed orders for GPS Cancer.  Instead, he attempted to justify the November statements by saying, "the gene sequencing work for the university was done on the same machines that perform the [GPS] cancer test."

105.   In reality, there were not 180 GPS Cancer profiles completed as part of the research for the University—instead, per the Services Agreement and in

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 2:17-cv-01825-BRO-MRW

point of fact, zero such profiles were completed as part of that research, which the Company and the Officer Defendants knew or were reckless in not knowing. The Company and the Officer Defendants also knew that monetizing GPS Cancer was central to NantHealth's prospects but that demand for GPS Cancer was slow, relative to the expectations created by the Company's prior public statements.

106. The Company and the Officer Defendants also knew or were reckless in not knowing that the 11/7/16 8-K and 11/7/16 Conference Call contained false and misleading statements and omitted material information to the extent they reported that NantHealth was performing GPS Cancer sequencing for the University when it was not. The Company and the Officer Defendants thereby artificially inflated NantHealth's third quarter 2016 GPS Cancer-related order numbers, and exaggerated the use of and demand for GPS Cancer, a product central to NantHealth's business, revenues and future prospects.

107. On November 10, 2016, NantHealth filed its 2016 third quarter results with the SEC on Form 10-Q (the "11/10/16 10-Q"), using language similar to that used in its 8/15/16 10-Q concerning its relationship with the University:

> In January 2015, the Company entered into an agreement to provide certain research related sequencing services to a university which is engaged in researching the genetic causes of certain hereditary diseases. The agreement provides that the university pay the Company $10,000[,000] in exchange for the Company providing sequencing services.

> At the request of the university, *certain public and private charitable 501(c)(3) non-profit organizations provided* <u>*partial*</u> *funding for the sequencing and related bioinformatics costs associated with the project*. The Company's Chairman and CEO serves as the CEO and a member of the board of directors of each of the non-profit organizations and by virtue of these positions he may have influence or control over these organizations. ***The university*** <u>***was not contractually or otherwise required***</u> ***to use the Company's molecular profiling solutions or any of the Company's other***

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 2:17-cv-01825-BRO-MRW

*products or services as part of the charitable gift*, however*, the university did not have a requirement to order or pay for the services* __unless it first received private donor funding for the project__. As a result, the Company does not classify the fees related to this project as revenue but instead classifies the amounts as deemed capital contributions from the Company's Chairman and CEO.

(Emphasis added.)

108.   The Company and the Officer Defendants knew or were reckless in not knowing that the 11/10/16 10-Q furthered the false and misleading nature of the University relationship by indicating that the University had freely chosen to use NantHealth's research services in the Heritage 1K Project, which was not true or accurate and falsely portrayed existence of market demand and future business prospects for NantHealth services that did not truly exist, and which omitted the existence of potential future liabilities and lost business opportunities.

109.   The Company and the Officer Defendants also knew or were reckless in not knowing that the statement furthered the false and misleading impression that the Soon-Shiong-controlled nonprofits provided only "partial" funding of the Heritage 1K Project, suggesting that either the University or some other independent and objective third party was motivated and willing to fund the research services, implying a market demand and future business prospects for NantHealth services.

110.   During an investor conference call on March 7, 2017 after the market closed for trading (the "3/7/17 Conference Call"), an unidentified NantHealth representative reiterated that there were supposedly 524 GPS Cancer tests ordered in Q3: "So let's talk about GPS [Cancer] by the numbers.  These are Q3 numbers.  End of Q3, there's about 170 ordering physicians.  There were 524 tests in the quarter."

111.   Statements on the 3/7/17 Conference Call were materially false and misleading and omitted material information to the extent they overstated the total

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 2:17-cv-01825-BRO-MRW

figure (524) by including the 180 non-GPS Cancer tests, and thereby artificially inflated NantHealth's third quarter 2016 GPS Cancer-related order numbers, and exaggerated the use of and demand for GPS Cancer, a product central to NantHealth's business, revenues and future prospects.

112. On March 31, 2017, NantHealth filed its 2016 year end results with the SEC on Form 10-K (the "2016 Form 10-K"), signed by Soon-Shiong, Holt, and the Director Defendants, in which NantHealth made the following statement concerning its relationship with the University:

**GPS in Rare Diseases and Chronic Illnesses**

Although we are deploying GPS initially for cancer, we believe this solution has potential application in identifying molecular profiles and germline mutations in rare diseases and chronic illnesses. Our molecular profile solutions are being used by a large academic research institution to examine the genomic familial drivers of cardiac disease and to perform additional research in ALS, obesity, suicide and diabetes, among other diseases.

For example, in July 2016, NantHealth announced a partnership with the University of Utah to analyze the entire genomic profiles of at least 1,000 individuals who have a history of rare and life-threatening diseases and conditions in their respective families. The landmark project is focusing on researching the genetic causes of 25 conditions, including, breast, colon, ovarian, and prostate cancers, amyotrophic lateral sclerosis (ALS), chronic lymphocytic leukemia, autism, preterm birth, epilepsy, and other hereditary conditions.

113. The 2016 Form 10-K contained false and misleading misstatements and omissions to the extent that it: (1) omitted the agreements with the University obligating the University to contract with NantHealth to provide the research services; and (2) conveyed the idea that the University research work deployed GPS Cancer (for example, by introducing the University work as an "example" of GPS's Cancer's expansion), when NantHealth did not in fact deploy GPS Cancer

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 2:17-cv-01825-BRO-MRW

in connection with its research work for the University.  These statements thus exaggerated demand, revenue, and future business prospects for NantHealth services, and omitted the existence of possible future liabilities and the risk of lost business.

**II.     Notes Issuance**

114.   On or about December 21, 2016, NantHealth issued $100 million in senior unsecured notes, $90 million of which were sold to unaffiliated entities (the "Notes").  The Notes are set to mature on December 15, 2021, but are convertible, "at NantHealth's election," into stock at a conversion price of 12.1375 and a conversion ratio of 82.3893.

**III.    Truth Revealed**

115.   During the Class Period, the price of NantHealth common stock was artificially inflated as a result of the material misrepresentations and omissions set forth above.  The artificial inflation was removed through a series of partial disclosures and the materialization of previously-concealed risks.

116.   In its 11/7/16 8-K, NantHealth reported that it had had received only 524 total GPS Cancer test orders in the third quarter.  NantHealth further stated that of those 524, it was not able to count 180 of them as revenue because they were purportedly encompassed within the research services provided to the University (this would later be revealed as further fiction).  The Company also reported that it had actually delivered only 334 of the GPS Cancer tests.

117.   Thus it became clear that NantHealth had not been able to "ramp up" the sale of GPS Cancer as its previous public statements had suggested.

118.   On November 7, 2016, a Canaccord analyst report stated, "Our estimates go meaningfully lower due to a slower ramp in scan orders. … There were only 524 scans ordered in 3Q'16, which was above our estimate for 300.  However, only 334 scans were completed, and of those, 180 were completed

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 2:17-cv-01825-BRO-MRW

1   for the University of Utah, a research program which is under a contract with NH
2   that was established prior to the company's IPO and stipulates no revenue could
3   get recognized."

4       119.   A November 8, 2016, Cowen and Company analyst report similarly
5   stated: "Revenue missed our expectations mainly due to GPS cancer, which was
6   clearly lower than what we anticipated from revenue recognition issues."

7       120.   And a Cowen and Company analyst report dated November 29, 2016
8   stated: "slower than expected adoption of GPS . . . we lower our est[imate]s to
9   acc[oun]t for a slower ramp."

10      121.   A subsequent article published by *STAT* on February 14, 2017, wrote
11  that "physicians have not quickly warmed" to the GPS Cancer test, citing the third
12  quarter 2016 figure and saying "only 524 tests were ordered in the third quarter of
13  last year."

14      122.   On November 8, NantHealth's stock price fell $1.08, from $11.17 to
15  $10.09.  This represents a 9.7% decline versus the prior day's close and 7.7% of
16  the IPO price.  The volume of trading that day was 198,349 shares, which was
17  67% above the median volume of trading of NantHealth shares during the Class
18  Period.[1]  More than $130 million in market capitalization was lost on November 8,
19  2016.

20      123.   On the morning of March 6, 2017, *STAT* published an article
21  exposing the details of NantHealth's agreements with the University, writing that
22  "$10 million of his [Soon-Shiong's] donation would be sent right back to one of

23

24  _____

25  [1] The calculation of median volume of trading of NantHealth shares was
    calculated exclusive of the first day of open market trading.  In other words, the
26  volume number used for comparison purposes in this Complaint – 119,163 –
    represents the median volume of NantHealth shares traded between June 3, 2016
27  and May 1, 2017, inclusive.

28

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 2:17-cv-01825-BRO-MRW

his companies.  And the contract for his gift was worded in a way that left the University of Utah with no other choice."

124.   The *STAT* article also revealed, "the deal made it possible for his company to inflate, by more than 50 percent, the number of test orders it reported to investors late last year while updating them on interest in . . . GPS Cancer . . . even though the work for the university did not have anything to do with diagnosing or recommending treatments for cancer patients."

125.   The article wrote, further, that "Four tax experts who reviewed the contracts at STAT's request all agreed that the Utah deal was suspicious," while "[t]wo said it appeared to violate federal tax rules governing certain charitable donations, amounting to indirect self-dealing."

126.   On March 6, 2017, NantHealth's stock price fell $1.67, from $7.17 to $5.50.  This represents a 23.3% decline versus the prior day's close, and 11.9% of the IPO price.  The volume of trading that day was 946,383, or nearly eight times the median volume of shares traded during the Class Period.  More than $202 million in market capitalization was lost that day as well.

127.   On March 6, 2017, Cantor Fitzgerald issued an analyst report which stated, "NantHealth shares are selling off today, probably due to a negative article published by StatNews.com. … The article suggests that donations to the University of Utah from NH's CEO, Dr. Patrick Soon-Shiong, bolstered the company's operating metrics."

128.   On March 7, 2017, *The Los Angeles Times* further promulgated the allegations in *STAT's* March 6 article.   Soon-Shiong is the second-largest shareholder and vice chairman of Tronc Inc., which owns *The Los Angeles Times*. *The Los Angeles Times* article on March 7 quoted Soon-Shiong as saying the *STAT* article had been "maliciously false."   Soon-Shiong did not deny, however, that the University did not order GPS tests; instead he tried to explain away his

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 2:17-cv-01825-BRO-MRW

false statements by stating that the sequencing was performed on the same machines as GPS testing.

129.   On March 7, 2017, NantHealth's stock price fell $0.56, from $5.50 to $4.94.  This represents a 10.2% decline versus the prior day's close, and 4.0% of the IPO price.  The volume of trading that day was 703,772, or nearly six times the median volume of shares traded during the Class Period.  More than $67 million in market capitalization was lost that day as well.

130.   On March 8, 2017, *STAT* published another article, noting that "[n]othing in *The LA Times* article refuted STAT's reporting."

131.   On March 8, 2017, NantHealth's stock price fell $0.30, from $4.94 to $4.64.  This represents a 6.1% decline versus the prior day's close, and 2.1% of the IPO price.  The volume of trading that day was 442,390, or nearly four times the median volume of shares traded during the Class Period.  More than $36 million in market capitalization was lost that day as well.

132.   With respect to NantHealth's Notes, on March 6, 2017, the price fell $4.06 (4.7%), from $85.86 to $81.80, and had fallen to $75.51 (12% below the starting point) by the end of the week.

133.   On Sunday, April 9, 2017, *Politico* published a lengthy report on Soon-Shiong's pattern of "philanthropic" self-dealing for the benefit of his for-profit businesses.  *Politico* found that "the majority" of the funds expended by the Chan Soon-Shiong NantHealth Foundation "flow to businesses and not-for-profits controlled by Soon-Shiong himself, and the majority of its grants have gone to entities that have business deals with his for-profit firms."  This statement placed Soon-Shiong's and NantHealth's behavior in the context of a pattern of wrong-doing, supporting *STAT's* reporting.

134.   On April 10, 2017, NantHealth's stock price fell $0.75, from $5.20 to $4.45.  This represents a 14.4% decline versus the prior day's close, and 5.3% of

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 2:17-cv-01825-BRO-MRW

1  the IPO price.  The volume of trading that day was 716,490, or six times the
2  median volume of shares traded during the Class Period.  More than $91 million
3  in market capitalization was lost that day as well.

4        135.   On April 11, 2017, NantHealth's stock price fell $0.21, from $4.45 to
5  $4.24.  This represents a 4.7% decline versus the prior day's close, and 1.5% of
6  the IPO price.  The volume of trading that day was 190,578, or sixty percent above
7  the median volume of shares traded during the Class Period.  More than $25
8  million in market capitalization was lost that day as well.

9        136.   With respect to NantHealth's Notes, on April 10, 2017, the price fell
10  $3.62 (4.6%), from $78.46 to $74.84; the Notes' price dropped an additional $0.88
11  on April 11.  Combined, on April 10-11, 2017, the Notes' price dropped $4.50
12  (5.7%), from $78.46 to $73.96.

13        137.   On the morning of April 13, 2017, *L.A. Weekly* published a detailed
14  article on the allegations against NantHealth and Soon-Shiong.  The article said
15  that Soon-Shiong's spokesperson, when asked for an example of the *Politico*
16  article's supposed "numerous inaccuracies and misleading statements," stated:
17  "We're not gonna go point by point on this."

18        138.   On April 13, 2017, the stock price fell $0.20, from $4.06 to $3.86.
19  This represents a 4.9% decline versus the prior day's close, and 1.4% of the IPO
20  price.  The volume of trading that day was 236,822, or nearly twice the median
21  volume of shares traded during the Class Period.  More than $24 million in market
22  capitalization was lost that day as well.

23        139.   On Friday, April 14, 2017, a market holiday, *STAT* published an
24  article that reported on "more than a dozen" internal documents it had obtained,
25  which, according to *STAT*, "make clear that executives at NantHealth and officials
26  at the university viewed the deal through a transactional lens, intended, at least in
27  part, to boost Soon-Shiong's commercial interests."

28

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 2:17-cv-01825-BRO-MRW

140.   The article reported on the MOU and how it was drawn up in early "September 2014, days before the donation was made official," and that it "stipulat[ed] that the genetic analysis to be paid for by Soon-Shiong's gift would be done by Soon-Shiong's team."

141.   On April 17, 2017, NantHealth's stock price fell $0.22, from $3.86 to $3.64. This represents a 5.7% decline versus the prior day's close, and 1.6% of the IPO price. The volume of trading that day was 136,618, or fourteen percent above the median volume of shares traded during the Class Period (and on a day, the Monday after Easter, where the market as a whole experienced only 80 percent of its 100-day average volume). More than $26 million in market capitalization was lost that day as well.

142.   On April 18, 2017, NantHealth's stock price fell $0.16, from $3.64 to $3.48. This represents a 4.4% decline versus the prior day's close, and 1.1% of the IPO price. The volume of trading that day was 198,727, or 67% above the median volume of shares traded during the Class Period. More than $19 million in market capitalization was lost that day as well.

143.   With respect to NantHealth's Notes, during the first two days of trading following of the April 14, 2017 *STAT* article, the bond price dropped $0.17 and $4.97, respectively. Combined, on April 17-18, 2017, the Notes' price dropped $5.13 (7.0%) from $75.17 to $70.04.

144.   On April 24, 2017, before the markets opened for trading, *Bloomberg* published an article entitled "Billionaire Doctor's $11,000 Cancer Test Has Few Takers So Far."

145.   The article stated: "NantHealth is giving away the vast majority of the commercially ordered tests" that NantHealth had reported selling. It quoted Paul Knight, an Analyst at Janney Montgomery Scott, who observed: "They seem to distribute an extraordinary number of tests that aren't paid for."

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 2:17-cv-01825-BRO-MRW

146.   The article also bolstered accusations that NantHealth had artificially inflated the success and popularity of GPS Cancer.  Specifically, it explained that NantHealth "reported $100.4 million . . . in 2016 revenue but didn't break out how much came from the diagnostic tests," highlighting that NantHealth "also sells various software services to payers and hospitals."  The article also noted that two of eight payers NantHealth "says it has signed up . . . are double counted," and that the "eight insurers and employers who say they'll use the tests . . . aren't rushing to place orders."

147.   On this news, NantHealth's stock price fell $0.10, from $3.30 to $3.20, on April 24, 2017.  This represents a 3.0% decline versus the prior day's close, and 0.7% of the IPO price.  The volume of trading that day was 213,168, or 79% higher than the median volume of shares traded during the Class Period. More than $12 million in market capitalization was lost that day as well.

148.   During trading hours on April 26, 2017, *The Salt Lake Tribune* reported the Speaker of the Utah State House of Representatives had said late the day before that "lawmakers . . . had reason to look into" the University because of its arrangement with NantHealth.

149.   On this news, NantHealth's stock price fell $0.29, from $3.53 to $3.24, on April 26, 2017.  This represents an 8.2% decline versus the prior day's close, and 2.1% of the IPO price.  The volume of trading that day was 290,327, well more than twice the median volume of shares traded during the Class Period. More than $35 million in market capitalization was lost that day as well.

150.   After trading hours on April 27, 2017, *Deseret News* published an article quoting a University spokesperson who confirmed NantHealth was the only organization that met the "specific requirements" stipulated in the Gift Agreement.

151.   Also, on April 28, 2017, *The Cancer Letter* reported on the Services Agreement, quoting both Paul Wolpe, who discussed Soon-Shiong's conflict of

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 2:17-cv-01825-BRO-MRW

interest, and Hakon Hakonarson, who discussed the striking similarities between the Gift Agreement and the Services Agreement, as described above. *The Cancer Letter* also reported the University's statement that "No future collaborations with NantHealth are planned."

152.  On this news, NantHealth's stock price fell $0.21, from $3.32 to $3.11, on April 28, 2017.  This represents a 6.3% decline versus the prior day's close, and 1.5% of the IPO price.  The volume of trading that day was 132,281, or 11% above the median volume of shares traded during the Class Period.  More than $25 million in market capitalization was lost that day as well.

153.  After trading hours on Friday, April 28, 2017, news broke that the University of Utah Health Care System's CEO had resigned.

154.  *The Salt Lake Tribune* reported it was believed that the CEO's resignation was "related to her dealings with Patrick Soon-Shiong."

155.  On Monday, May 1, 2017, NantHealth's stock price fell $0.13, from $3.11 to $2.98.  This represents a 4.2% decline versus the prior day's close, and 0.9% of the IPO price.  The volume of trading that day was 198,034, or 66% above the median volume of shares traded during the Class Period.  More than $15 million in market capitalization was lost that day as well.

## PRESUMPTION OF RELIANCE
## WITH RESPECT TO THE EXCHANGE ACT CLAIMS

156.  Plaintiffs are entitled to a presumption of reliance on NantHealth's and the Officer Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market doctrine.

157.  At all relevant times, the market for NantHealth's securities was an efficient market for the following reasons, among others:

     a.  NantHealth stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated

market, and NantHealth's bonds were actively and efficiently traded on the over-the-counter corporate bond market;

b. As a regulated issuer, NantHealth filed periodic public reports with the SEC;

c. NantHealth regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d. NantHealth was followed by securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s).  Each of these reports was publicly available and entered the public marketplace.

158.  As a result of the foregoing, the market for NantHealth securities promptly digested current information regarding NantHealth from all publicly available sources and reflected such information in the price of NantHealth securities.  Under these circumstances, all members of the Exchange Act Class suffered similar injury through their purchase of NantHealth securities at artificially inflated prices and the presumption of reliance applies.

159.  A class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Exchange Act Class' claims are grounded on NantHealth's and the Officer Defendants' material omissions.

160.  Because this action involves NantHealth's and the Officer Defendants' failure to disclose material adverse information regarding

NantHealth's financial prospects, the Company's ability to generate revenue through its GPS Cancer product, the true nature of NantHealth's dealings with the University, and the supposed success in improving its financial performance—information that NantHealth and the Officer Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.

161.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the engagement with the University and the viability of the GPS Cancer product to NantHealth's business, as set forth above, that requirement is satisfied here.

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

162.  The statutory safe harbor or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to any of the false and misleading statements pleaded in this Complaint.  None of the statements complained of herein was a forward-looking statement.  Rather, they were historical statements or statements of purportedly current facts and conditions at the time the statements were made, including statements about the nature of NantHealth's engagement with the University, its financial health, and the viability of its GPS Cancer product.  Moreover, the statutory safe harbor does not apply to statements included in financial statements that purport to have been prepared in accordance with GAAP.

163.  To the extent that any of the false and misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.  As set forth above in detail, then-existing facts contradicted NantHealth and the Officer Defendants' statements regarding the nature of NantHealth's engagement with the

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 2:17-cv-01825-BRO-MRW

University, its financial health, and the viability of its GPS Cancer product, among others.  Given the then-existing facts contradicting NantHealth and the Officer Defendants' statements, any generalized risk disclosures made by NantHealth were not sufficient to insulate them from liability for their materially false and misleading statements.

164.   To the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, NantHealth and the Officer Defendants are liable for those false forward-looking statements because at the time each of those statements was made, the particular speaker knew that the particular forward-looking statement was false, and the false forward-looking statement was authorized and approved by an executive officer of NantHealth who knew that the statement was false when made.

## CAUSES OF ACTION UNDER THE SECURITIES ACT

### Count I: Violations of Section 11 of the Securities Act
### Against NantHealth, the Officer Defendants and Director Defendants

165.   Plaintiffs repeat and reallege each and every allegation contained above and further allege as follows.  This Count is based on negligence and strict liability and does not sound in fraud.  Any allegations of fraud or fraudulent conduct or motive are specifically excluded from this Count.

166.   This Count is asserted against NantHealth, the Officer Defendants and the Director Defendants for violations of Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of Plaintiffs and all members of the Securities Act Class who purchased or otherwise acquired the NantHealth securities in or traceable to the materially false and misleading NantHealth Registration Statement.

167.   The Registration Statement contained untrue statements of material fact and omitted to state other material facts necessary to make the statements made therein not misleading.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 2:17-cv-01825-BRO-MRW

168.   Defendants Soon-Shiong and Holt were executive officers and representatives of the company responsible for the contents and dissemination of the NantHealth Registration Statement.   Soon-Shiong was the Director of NantHealth and Holt signed the NantHealth Registration Statement in his capacity as Chief Financial Officer of the company, and caused and participated in the issuance of the NantHealth Prospectus.  By reasons of the conduct alleged, each of these defendants violated Section 11 of the Securities Act.

169.   The Director Defendants were directors of NantHealth at the time of the filing of the NantHealth Registration Statement.

170.   The Defendants named in this Count owed to the purchasers of the securities the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement, and any incorporated documents, at the time the IPO became effective to ensure that said statements were true and that there were no omissions of material fact which rendered the statements therein materially untrue or misleading.  Defendants did not make a reasonable investigation or possess reasonable grounds to believe that the statements contained in the Registration Statement were true, were without omissions of any material facts, and were not misleading.   Accordingly, Defendants acted negligently and are therefore liable to Plaintiffs and members of the Securities Act Class who purchased or otherwise acquired the securities sold pursuant or traceable to the materially false and misleading sold during the IPO.

171.   Plaintiffs and all members of the Securities Act Class who purchased or otherwise acquired NantHealth securities sold in or traceable to the Registration Statement did not know of the negligent conduct alleged or of the facts concerning the untrue statements of material fact and omissions alleged, and by the reasonable exercise of care could not have reasonably discovered such facts or conduct.

172.   None of the untrue statements or omissions alleged in this Complaint was a forward-looking statement but, rather, each concerned existing facts. Moreover, the Defendants named in this Count did not properly identify any of these untrue statements as forward-looking statements and did not disclose information that undermined the validity of those statements.

173.   Less than one year elapsed from the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this Count is based from the time that the initial complaint was filed asserting claims arising out of the Registration Statement.   Less than three years elapsed from the time that the securities upon which this Count is brought were offered in good faith to the public to the time the initial complaint was filed.

174.   Plaintiffs and all members of the Securities Act Class have sustained damages.  The value of the securities sold pursuant or traceable to the materials presenting the IPO has declined substantially due to Defendants' violations of Section 11 of the Securities Act.

175.   By reason of the foregoing, Defendants are liable for violations of Section 11 of the Securities Act to Plaintiffs and all members of the Securities Act Class.

### Count II: Violations of Section 12(a)(2) of the Securities Act Against NantHealth

176.   Plaintiffs repeat and reallege each and every allegation contained above and further allege as follows.

177.   This Count is asserted against NantHealth for violations of Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), on behalf of all persons and entities who purchased or otherwise acquired the NantHealth securities in the IPO and were damaged thereby.

178.   NantHealth was a seller, offeror, or solicitor of sales of NantHealth securities issued in connection with the offerings set forth during the IPO within

41

the meaning of the Securities Act.  NantHealth used means and instrumentalities of interstate commerce and the United States mail.

179.  The Prospectus contained untrue statements of material fact and omitted other material facts necessary to make the statements, in light of the circumstances under which they were made, not misleading.

180.  Plaintiffs and other members of the Securities Act Class purchased or otherwise acquired NantHealth securities pursuant to the materially untrue and misleading NantHealth Prospectus and did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the Prospectus.

181.  Less than one year elapsed from the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this Count is based to the time that the initial complaint was filed asserting claims arising out of the falsity of the NantHealth Prospectus.  Less than three years elapsed from the time that the NantHealth securities upon which this Count is brought were offered to the public that the initial complaint was filed.

182.  Plaintiffs and other members of the Securities Act Class offer to tender to NantHealth the securities that Plaintiffs and other members of the Securities Act Class purchased and continue to own in return for the consideration paid for those securities, together with interest.

183.  By virtue of the conduct alleged in this Complaint, NantHealth violated Section 12(a)(2) of the Securities Act.  Accordingly, Plaintiffs and other members of the Securities Act Class who purchased NantHealth securities pursuant to the Prospectus have the right to rescind and recover the consideration paid for their securities, and hereby elect to rescind and tender their securities to NantHealth.  Plaintiffs and the members of the Securities Act Class who have sold their NantHealth securities are entitled to rescissory damages.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 2:17-cv-01825-BRO-MRW

## Count III: Violations of Section 15 of the Securities Act
### Against the Officer Defendants

184.   Plaintiffs repeat and reallege each and every allegation contained above and further allege as follows.

185.   This Count is asserted against the Officer Defendants for violations of Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of Plaintiffs and the other members of the Securities Act Class who purchased or otherwise acquired NantHealth securities pursuant or traceable to the NantHealth Prospectus and were damaged thereby.

186.   At all relevant times the Officer Defendants were controlling persons of the company within the meaning of Section 15 of the Securities Act.  Each Defendant served as an executive officer of NantHealth prior to and at the time of the IPO.

187.   The Officer Defendants at all relevant times participated in the operation and management of NantHealth, and conducted and participated, directly and indirectly, in the conduct of NantHealth's business affairs.  As officers of a publicly owned company, the Officer Defendants had a duty to disseminate accurate and truthful information with respect to NantHealth's condition and results of operations.  Because of their positions of control and authority as officers or directors of NantHealth, the Officer Defendants were able to, and did, control the contents of the Offering Materials, which contained materially untrue information.

188.   By reason of the aforementioned conduct, each Officer Defendant is liable under Section 15 of the Securities Act, jointly and severally, to Plaintiffs and other members of the Securities Act Class.  As a direct and proximate result of the conduct of the Officer Defendants, Plaintiffs and the other members of the Securities Act Class suffered damages in connection with their purchase or acquisition of NantHealth securities in the IPO.

43

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 2:17-cv-01825-BRO-MRW

**CAUSES OF ACTION UNDER THE EXCHANGE ACT**

**Count IV: Violations of Section 10(b) of the Exchange Act
Against NantHealth and the Officer Defendants**

189.   Plaintiffs repeat and reallege the allegations set forth above, except for those allegations disclaiming any attempt to allege fraud, and further allege as follows.

190.   This claim is asserted against NantHealth and the Officer Defendants on behalf of Plaintiffs and other members of the Exchange Act Class who purchased or otherwise acquired NantHealth securities and call options and/or who sold put options during the Class Period and were damaged thereby.

191.   NantHealth and the Officer Defendants individually or in concert, by the use of means or instrumentalities of interstate commerce and/or of the United States mail: (1) employed devices, schemes, and artifices to defraud; (2) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; (3) deceived the investing public, including Plaintiffs and other Exchange Act Class members; (4) artificially inflated and maintained the market price of NantHealth stock, bonds, and options; and (5) caused Plaintiffs and other members of the Exchange Act Class to purchase NantHealth common stock and options at artificially inflated prices and suffer losses.  NantHealth and the Officer Defendants were primary participants in this wrongful and illegal conduct.

192.   The Officer Defendants were top officers and controlling persons of NantHealth, and had direct involvement in its day-to-day operations.   The materially misstated information presented in group-published documents, including NantHealth's Forms 8-K, 10-Q and 10-K, was the collective action of NantHealth and the Officer Defendants.  These Defendants were each involved in

1   drafting, producing, reviewing, and/or disseminating the group-published

2   documents at issue in this action.

3        193.   NantHealth and the Officer Defendants had actual knowledge, or

4   were reckless in not knowing, of the misrepresentations and omissions of material

5   facts set forth in this Complaint or acted with reckless disregard for the truth in

6   that they failed to ascertain and to disclose such facts, even though such facts were

7   readily available to them.  The Officer Defendants' material misrepresentations

8   and omissions were done knowingly or recklessly and for the purpose and effect

9   of concealing NantHealth's financial condition and results of operations, business

10   practices, and future business prospects from the investing public and supporting

11   the artificially inflated price of its securities.

12        194.   As a result of the dissemination of the materially false and misleading

13   information and failure to disclose material facts, as set forth above, the market

14   price of NantHealth stock, Notes, and options was artificially inflated and caused

15   loss to Plaintiffs when NantHealth's stock and bond price fell in response to the

16   issuance of partial corrective disclosures.

17        195.   By virtue of the foregoing, NantHealth and the Officer Defendants

18   each violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated

19   thereunder.

20        196.   This claim was brought within two years after the discovery of the

21   fraud and within five years of the making of the materially false and misleading

22   statements alleged.

23        197.   As a direct and proximate result of the wrongful conduct of the

24   NantHealth and the Officer Defendants, Plaintiffs and other Exchange Act Class

25   members suffered damages in connection with their purchases or acquisitions of

26   the company's common stock, notes, and call options and/or sale of put options.

27

28

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 2:17-cv-01825-BRO-MRW

## Count V: Violations of Section 20(a) of the Exchange Act
## Against the Officer Defendants

198.   Plaintiffs repeat and reallege each and every allegation contained above, except for those allegations disclaiming any attempt to allege fraud, and further allege as follows.

199.   This claim is asserted against the Officer Defendants on behalf of Plaintiffs and other members of the Exchange Act Class who purchased or otherwise acquired NantHealth stock, Notes, and call options and/or who sold put options during the Class Period and were damaged thereby.

200.   The Officer Defendants were and acted as controlling persons of NantHealth within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions with the company, participation in and awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and intimate knowledge of the Company's actual performance, the Officer Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements, which Plaintiffs contend are false and misleading.  Each Defendant named in this Count was provided with or had unlimited access to copies of the company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and shortly after these statements were issued and had the ability to prevent the issuance of the false statements and material omission or cause such misleading statements and omissions to be corrected.  In addition, Defendant Soon-Shiong, through his position as CEO and Chairman of NantHealth, controlled Holt.

201.   As set forth above, Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  Due to their controlling positions over NantHealth, and Soon-Shiong's control over Holt,

46

Defendants Soon-Shiong and Holt are each liable pursuant to Section 20(a) of the Exchange Act having culpably participated in the fraud.   As a direct and proximate result of Defendants Soon-Shiong's and Holt's wrongful conduct, Plaintiffs and other members of the Exchange Act Class suffered damages in connection with their purchases or acquisition of the company's stock, Notes, and call options and/or sale of put options.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on their own behalf and on behalf of the Securities Act Class and Exchange Act Class, pray for judgment as follows:

a. Declaring this action to be a class action pursuant to Fed. R. Civ. P. 23(a) and (b)(3);

b. Awarding Plaintiffs and the other members of the Securities Act Class and Exchange Act Class damages in an amount which may be proven at trial, together with interest thereon;

c. Awarding Plaintiffs and the members of the Securities Act Class and Exchange Act Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and expert witness' fees and other costs;

d. Awarding Plaintiffs and the members of the Securities Act Class rescission and/or rescissory damages; and

e. Such other relief as this Court deems appropriate.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 2:17-cv-01825-BRO-MRW

## **DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury.

Dated: June 26, 2017                    Respectfully submitted,

*/s/ David Stein*

**GIBBS LAW GROUP LLP**
Eric H. Gibbs (Bar # 178658)
David Stein (Bar # 257465)
Amanda M. Karl (Bar # 301088)
ehg@classlawgroup.com
ds@classlawgroup.com
amk@classlawgroup.com
505 14th Street, Suite 1110
Oakland, CA 94612-1406
Telephone: (510) 350-9700
Facsimile: (510) 350-9701

**KEHOE LAW FIRM, P.C.**
John A. Kehoe
jkehoe@kehoelawfirm.com
Two Penn Center Plaza
1500 JFK Boulevard, Suite 1020
Philadelphia, PA 19102
Telephone: (215) 792-6676

*Counsel for Co-Lead Plaintiffs and Lead*
*Counsel for the Class*

48

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 2:17-cv-01825-BRO-MRW